# EXHIBIT Z

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 87128 / September 26, 2019**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-19531**

| | |
|---|---|
| **In the Matter of**<br><br>**QUAD/GRAPHICS, INC.,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Quad/Graphics, Inc. ("Quad" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

1

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

**Summary**

1.      This matter concerns violations of the Foreign Corrupt Practices Act (the "FCPA") [15 U.S.C. 78dd] by Quad/Graphics, Inc., a marketing solutions and printing services provider headquartered in Sussex, Wisconsin.  From at least 2011 to January 2016, Quad engaged in multiple bribery schemes to secure business by paying or promising over a million dollars in bribes through subsidiaries in Peru and China.  In one bribery scheme, Quad/Graphics Peru S.A. ("Quad Peru"), paid or promised bribes to government officials in Peru to win sales contracts from the Peruvian National Institute of Statistics and Information ("INEI") and other government municipalities, and to avoid penalties on existing contracts with the Ministry of Education ("MINEDU").  Quad Peru also participated in a judicial bribery scheme when it tried to influence the outcome of a tax dispute with the Superintendencia Nacional de Aduanas y de Administración Tributaria ("SUNAT"), the Peruvian tax authority, which had imposed over $12,000,000 in Value-Added Tax ("VAT"), interest, penalties and fines.  In 2012 and 2013, Quad Peru paid over $200,000 in bribes through a local counsel to judges involved in the litigation.  In another scheme, from 2010 to 2015, Quad's subsidiary, Quad/Tech Shanghai Trading Company ("Quad/Tech China"), paid or promised approximately $182,000 in improper payments to employees of private and government customers through sham sales agents to secure business.  Quad employees utilized various means and instrumentalities of U.S. interstate commerce to facilitate the bribery schemes in Peru.

2.      In addition to bribery, Quad Peru also violated U.S. sanctions and export control laws by engaging in commercial transactions with a state controlled Cuban telecommunications company, Empresa de Telecomunicaciones de Cuba S.A. ("ETECSA"), and violated the FCPA's books and records provisions by creating false records to conceal the transactions.  Generally, these sanctions and export control laws prohibit business transactions with sanctioned countries that involve U.S. persons, companies or goods.  None of Quad's improper payments in Peru or China were accurately reflected in its books and records and Quad failed to have sufficient internal accounting controls in place to detect or prevent the various misconduct.  Quad was unjustly enriched by approximately $7 million as a result of these schemes.

**Respondent**

3.      Quad/Graphics, Inc. is a publicly traded marketing solutions and printing services provider headquartered in Sussex, Wisconsin, with operations in 10 countries.  Since 2010, Quad's common stock has been registered in the United States pursuant to Section 12(b) of the Exchange Act.  It trades on the NYSE under the ticker "QUAD" and files periodic reports,

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

including Forms 10-K, with the Securities and Exchange Commission as required under Section 13(a) of the Exchange Act.

## Relevant Entities

4.      Quad/Graphics Peru S.A. ("Quad Peru"), formerly known as World Color Peru, is a wholly owned subsidiary of Quad.  The Lima, Peru, plant specializes in printing and assembling packets for educational textbooks and exams.  It also prints directories, magazines, catalogs and retail inserts.  It also prints and publishes board books and telephone directories.  During the relevant period, Quad Peru's books and records were consolidated into the financial statements of Quad.

5.      Quad/Tech Shanghai Trading Company, Ltd. ("Quad/Tech China") was a wholly-owned subsidiary of Quad/Graphics, Inc.  Quad/Tech China sold automated systems for commercial, newspaper, packaging and publication printers.  During the relevant period, Quad /Tech China's books and records were consolidated into the financial statements of Quad.

## FACTS

## BACKGROUND

6.      Prior to 2010, Quad was a privately held printing company headquartered in Sussex, Wisconsin, with a focus on domestic sales.  With the July 2010 acquisition of World Color Press, Inc. ("World Color"), a Canadian printing company, Quad quickly became a public company with a major international presence.  Quad acquired over 16,000 World Color employees, several subsidiaries, and multiple plants throughout Latin America, and its common shares began trading on the NYSE.  Despite becoming a publicly traded company with a large global workforce and operations in high risk areas, Quad's compliance program was almost non-existent in 2010.  At the time, Quad failed to implement sufficient internal accounting controls or anti-corruption policies and procedures and failed to conduct meaningful due diligence on third parties.  Likewise, internal audit had no visible role in anti-corruption testing and the company failed to conduct broad FCPA or ethics training until approximately 2012.  It appointed its first Director of Compliance, an individual with no compliance experience or training and an information technology background, in 2011.

7.      From at least 2011 to 2016, Quad's failure to implement a robust compliance program and maintain sufficient internal accounting controls contributed to ongoing bribery schemes in Peru to obtain business and win favorable outcomes in tax litigation.  The schemes were facilitated through third party vendors.  Quad's then Operations Executive for Latin America and a then Finance Executive for Latin America, both based in the U.S., either ignored significant red flags or participated in the misconduct.  These failures also allowed Quad/Tech China's bribery of customers to facilitate systems sales to continue from 2010 to 2015, and Quad Peru's sanctions violations in connection with the sale of goods to Cuba in 2012.  None of the improper payments were accurately reflected in Quad's books and records and its internal accounting controls were not reasonably designed to detect or prevent them.

3

**Bribery to Secure Sales in Peru**

8.      In 2011, Quad Peru's former Head Sales Executive was approached by an individual with influence in the Peruvian government who requested that Quad Peru pay him a "commission" in exchange for a government contract with INEI, one of Quad Peru's largest customers.  Quad Peru's Head Sales Executive obtained verbal approval to pay the bribe from Quad Peru's former General Manager.  Thereafter, from 2011 to 2016, Head Sales Executive continued to make payments with the expectation that bribes would be paid to government officials to secure contracts, primarily with INEI, and also to other officials at government municipalities in Peru.  The improper payments were made through four purported third party vendors, which were sham companies owned by the same individual ("Sham Vendors").

9.      The four Sham Vendors were all registered in Lima, Peru, three with the same address, and had no real business operations.  The Sham Vendors were used to pay bribes to both government officials and private customers on behalf of Quad Peru.  Quad failed to conduct any due diligence on the Sham Vendors.

10.      Most of the invoices submitted by the Sham Vendors were purportedly for pre-press, modulation and/or packaging services provided to Quad Peru in connection with INEI contracts.  In truth, none of the Sham Vendors performed any such services for Quad Peru.  Instead, pre-press, modulation and packaging services were performed on site by Quad Peru employees or by unrelated external third parties.

11.      The bribes that Quad Peru paid to INEI officials were approximately 13% of each government contract work order and were paid through fake invoices for services submitted by the Sham Vendors that were routinely approved by the Quad Peru Head Sales Executive and the Quad Peru General Manager.

12.      Quad Peru's then Senior Finance Manager was aware of the improper commission payments.  He ensured that the related invoices from the Sham Vendors were paid after the Head Sales Executive and General Manager approved them.  As the volume of improper payments increased, the Senior Finance Manager became increasingly concerned about authorizing them.  He expressed his concerns to the General Manager but was brushed aside.

13.      In approximately 2013, the Senior Finance Manager, with another Manager present, contacted a Finance Executive for Latin America who was based in the United States to discuss the improper conduct.  The Finance Executive advised the Peru Senior Finance Manager not to forward any invoices directly to him and stated he would look into the matter.  Despite this reassurance, the Senior Finance Manager never heard back from the Finance Executive on the subject and no follow up occurred.  The improper commissions continued to be paid by wire transfers to accounts held by the Sham Vendors at various Peruvian banks or by checks that were hand delivered to the Sham Vendor's principal or the Sham Vendor's accountant in Peru.

14.    In addition to using the Sham Vendors to pay bribes to government officials to secure contracts, Quad Peru also used them to pay bribes to employees of private customers from at least 2013 to 2015 to secure business.

15.    In December 2014, the Finance Executive received additional notice of costs related to two of the Sham Vendors, when the Senior Finance Manager for Quad Peru emailed a copy of Quad Peru's standard monthly presentation for November 2014, to Quad in the U.S. for review as Quad was closely monitoring costs at Quad Peru.  The presentation contained a detailed analysis of Quad Peru's November operating results and identified large vendor costs for the two Sham Vendors.  In fact, Quad Peru's second and third largest costs that period were due to fake invoices submitted by these vendors.  Despite the Finance Executive's previous conversation with the Senior Finance Manager, the Finance Executive failed to inquire about the vendor costs and Quad Peru continued to pay additional bribes through phony invoices submitted by the Sham Vendors.

16.    Quad Peru's Senior Finance Manager eventually left the company in 2015.  In late 2015, a new Senior Finance Manager was hired from outside Quad.  Once the new Senior Finance Manager was in place, two concerned managers in Peru approached him about several suspicious invoices that had recently been submitted by two of the Sham Vendors.  Several of the invoices contained red flags, including having the same date and dollar amounts, and consecutive invoice numbers.  Upon review, the new Senior Finance Manager agreed the invoices were problematic and declined to approve them.  In January 2016, the Quad Peru Senior Finance Manager reported the matter to the Finance Executive, the same individual who, years earlier, was notified of similar suspicious payments by Quad Peru's former Senior Finance Manager.  After hearing from the new Senior Finance Manager, the Finance Executive reported the suspicious payments to his supervisor and then to Quad's U.S. Legal Department.

17.    In all, from at least 2011 to January 2016, Quad Peru paid or promised over $1 million in bribes through the Sham Vendors to secure contracts by which Quad was unjustly enriched by over $4.4 million.

18.    From 2011 through 2015, the Head Sales Executive and the General Manager of Quad Peru also used the Sham Vendors to pay over $117,000 in bribes to government officials at MINEDU to reduce penalties and extend the delivery dates on certain existing contracts in order to avoid defaulting on contracts with MINEDU.  From June 2011 to May 2013, Quad Peru paid over $45,000 in additional bribes to MINEDU officials in order to avoid penalties for failure to meet the terms of existing contracts with MINEDU.  These payments were made through a slush fund that was created with the assistance of seven other third party vendors.  As a result of this misconduct, Quad was unjustly enriched by over $970,000.

19.    The bribe payments were falsely recorded in Quad's books and records, primarily as pre-press or related services.  Quad lacked a system of internal accounting controls sufficient to detect or prevent the payments despite the presence of numerous red flags, including vendor invoices with rounded dollar amounts, large invoice amounts that were disproportionate to the

services described, invoices that were consecutively numbered (sometimes with the same date) and invoices without purchase orders or other supporting documentation.

20.    In addition, though Quad began providing some FCPA and anti-corruption training in Latin America in approximately 2012, it was not taken seriously by certain Quad Latin America employees.  High level Latin America executives failed to support the effort, as illustrated by one management meeting in Peru where sales performance issues were discussed, and the Operations Executive for Latin America alluded to bribery when he joked that everything about Quad Peru's operations could be changed except the Head Sales Executive, because he was the key to contracts with MINEDU, presumably due to his corrupt efforts to win those sales.

### Judicial Bribery Scheme in Peru

21.    During 2012 and 2013, Quad Peru also engaged in a judicial bribery scheme in Peru.  Starting in approximately 2000, SUNAT, the Peruvian tax authority, assessed what ultimately totaled over $12,000,000 in VAT, interest, penalties and fines against Quad Peru for failure to pay VAT on certain book sales to MINEDU.  Quad Peru (formerly World Color Peru) filed a complaint against SUNAT to challenge the tax assessment, and engaged in litigation that lasted for years.  As the amount in dispute grew over time, the potential loss of over $12,000,000 for unpaid VAT was a concern for Quad.  It was essentially the equivalent of approximately two years of profit for Quad Peru.

22.    In April 2010, Quad Peru retained a local Peruvian law firm to serve as outside counsel on the SUNAT litigation.  Quad Peru paid the law firm a monthly fee of approximately $1,000 to $1,200 for routine services related to the litigation.

23.    Sometime around 2011, after setbacks in the litigation and at the law firm's suggestion, Quad Peru's management agreed to use the law firm to facilitate the payment of bribes to Peruvian judges to try to influence their decisions on the SUNAT litigation.  Quad Peru's management obtained approval from the Operations Executive, based in the United States, to engage in the judicial bribery scheme.

24.    The first bribe occurred in approximately 2011, when Quad Peru's Senior Finance Manager arranged for payment of $20,000 to the law firm for purposes of bribing a judge.  The Senior Finance Manager obtained the $20,000 by having approximately two or three third party vendors, which had previously provided legitimate services, submit fake invoices.  Quad Peru paid the invoices and once the vendors received payment they returned some portion of the money to Quad Peru's former Head Sales Executive and the Senior Finance Manager.  The Senior Finance Manager then used the money to pay the law firm.  The third party vendors took part in the scheme so that Quad Peru would continue to hire them to perform other legitimate services.  The Senior Finance Manager personally delivered the $20,000 in cash to the law firm's office in Lima, Peru, for onward payment to a judge.

25.    Around the time that the bribe was paid, Quad had a significant victory in the SUNAT litigation.  In October 2011, the Litigation Court in Lima ruled in Quad Peru's favor on

the VAT issue.  The Court ruled that Quad Peru's dispute of SUNAT's tax assessment was founded.  However, SUNAT appealed the ruling and also challenged a previous injunction barring it from seizing Quad Peru's assets while the lawsuit was pending.

26.    In March 2012, the court cleared the way for SUNAT to seize Quad Peru's assets, including its cash and accounts receivables.  Quad Peru's operational infrastructure and materials, including its operating plant and other real property, also became subject to seizure.

27.    On July 24, 2012, Quad Peru signed a "success fee" contract with the law firm agreeing to pay the law firm a maximum of $208,000 if the law firm successfully defended Quad Peru in the ongoing SUNAT dispute.

28.    From September 2012 to late December 2012, SUNAT seized approximately $4.49 million from Quad Peru's bank accounts.  In addition, SUNAT seized approximately $7 million in cash receivables.

29.    On or about December 11, 2012, with approval from the Operations Executive in the U.S., Quad Peru agreed to pay the law firm an "extraordinary" fee so that the law firm could use the funds to bribe a judge and stop the seizure of Quad Peru's bank accounts and assets.  The bribe initially seemed successful, as two days later, on December 13, 2012, the Administrative court granted Quad Peru's request for a preliminary injunction contingent on the provision of a bank guarantee by Quad Peru of the full amount owed.  SUNAT appealed and the litigation continued.

30.    On December 14, 2012, the law firm issued an invoice to Quad Peru for $50,504 describing its services as "advice during the coercive execution process and in obtaining a precautionary measure."  Quad Peru's Senior Finance Manager signed off on the invoice and paid it the same day.

31.    Quad's documents and internal emails also referred to the bribe payments as "extraordinary fees."  This fee and later fees called "extraordinary" were in addition to the normal monthly payments made to the law firm.

32.    In April 2013, the law firm issued an invoice for $407,100 to fund additional bribes to judges.  Unwilling to take sole responsibility for the very large payment to the law firm, the Senior Finance Manager of Quad Peru forwarded the invoice by email to the Finance Executive, who was based in the U.S., for payment approval.  The Finance Executive then forwarded the invoice to the Operations Executive who was also in the U.S. and who also had knowledge of the bribery scheme.  After discussing the $407,100 invoice with the Operations Executive, the Finance Executive told the Senior Finance Manager to pay the invoice, despite the possibility the money would be used for bribery.

33.    Days later, Quad Peru wired a portion of the invoice amount, $230,000, to the law firm.  Payment was wired from Quad Peru's Miami, Florida bank account, an account typically used to pay for supplies, not attorney's fees.  Quad's Finance Executive told the Senior Finance

Manager how to account for the payment in Quad Peru's books and records due to his concern about it appearing in variance reports.

34. On or about June 7, 2013, the law firm refunded $173,181, roughly two thirds of the original $230,000 payment, to Quad Peru, keeping approximately $56,819. The law firm refunded the money because its attempt to bribe the appellate judges in charge of SUNAT's appeal was unsuccessful. This became evident days later on or about June 10, 2013, when 2 of the 3 appellate judges considering Quad Peru's appeal voted in favor of SUNAT.

35. Between 2012 and 2013, SUNAT seized approximately $11.89 million. In October 2013, Quad Peru made another payment of approximately $108,488 to the law firm. According to the invoice submitted by the law firm, the payment was a "contentious administrative procedure success fee related to SUNAT." The payment did not relate to any "success" on the part of the law firm. Instead it related, at least in part, to the law firm's assistance with the judicial bribery scheme. In all, Quad Peru made improper payments of approximately $209,752 to the law firm in connection with the failed judicial bribery scheme.

36. Ultimately, in the summer of 2014, SUNAT won its appeal of the lower court ruling in favor of Quad Peru. On or about November 3, 2014, Quad Peru filed an appeal of the decision with the Peruvian Supreme Court. The litigation finally concluded on or about March 20, 2018, when the Peruvian Supreme Court decided the case in favor of Quad Peru.

### Quad Conceals its Sales Transactions in Cuba

37. Before World Color, a Canadian company, was acquired by Quad in 2010, it regularly conducted business with Cuba. One of its largest clients was ETECSA, a state owned telecommunications company that purchased telephone directories from World Color Peru. Despite existing U.S. sanctions and export control laws, sales to Cuba continued after World Color's acquisition by Quad.

38. Certain Quad employees, including members of management in Peru and the former Operations Executive based in the U.S., concealed transactions with Cuba in internal emails and correspondence discussing the contract negotiations, financing arrangements, shipping and printing. Additional books and records were falsified to conceal the transactions, including references to "broker" that were intended to conceal the efforts to use a third party as a pass through company. As a result of the conduct, Quad's contracts, shipping documents, invoices, and journal entries were inaccurate.

39. In October 2010, Quad Peru signed a contract with ETECSA to print and sell Cuban telephone directories for approximately $1.2 million. Quad Peru arranged the sale even though it was prohibited by U.S. sanctions and export control laws. In early 2011, Quad Peru shipped the telephone directories to ETECSA.

40. Knowing that sales to ETECSA were barred by U.S. sanctions, the Operations Executive and Quad Peru's General Manager and Senior Finance Manager sought to conceal the

2010 Cuba sale from other executives in the U.S.  In an email dated March 8, 2011, the Operations Executive cautioned Quad Peru's Senior Finance Manager, its General Manager and several other Quad Peru employees that "[t]he USA legal department requested that we do not mention the word CUBA in our reports. This is a legal matter in the USA and at times our reports get to them."  The Operations Executive recommended using the initials of the customer, ETECSA, in reports instead.

41.     Around the same time, in early March 2011, the Operations Executive sent e-mails to the Senior Finance Manager asking whether Quad Peru had sent invoices to ETECSA in 2011, and also whether there was a plan to use a broker in the future.  The Senior Finance Manager responded that invoices for approximately $1.1 million had already been sent to ETECSA in 2011, and that they would use a Peruvian Agent as a broker going forward.

42.     By this time, members of management in Quad Peru and Latin America had developed a scheme through which Quad Peru attempted to conceal its sale to ETECSA by making it appear on its books and records that it had sales to a Peruvian Agent.  In fact, the Peruvian Agent was not a true customer but a pass through company used to conceal Quad's sales of telephone directories to Cuba.

43.     On or about April 11, 2011, Quad's Legal Department emailed the Operations Executive explaining that U.S. law prohibited trade between U.S. companies and Cuba.  The Legal Department added that as a result of the acquisition of World Color, Latin American subsidiaries could no longer sell products or provide services to customers in Cuba.  Lastly, the Legal Department asked the Operations Executive to confirm that Quad Peru was no longer selling or providing products or services to ETECSA.

44.     Despite knowing from prior communications with Quad Peru's Senior Finance Manager that Peru planned to continue unlawful sales to Cuba using the Peruvian Agent as a broker, the Operations Executive purposely misled the Legal Department, writing: "I verified this last month.  I confirm Peru is no longer producing any work for Cuba….They were also instructed not to accept any work from [C]uban customers."

45.     On February 24, 2012, Quad Peru signed a purported sales contract with the Peruvian Agent, to print telephone directories for ETECSA in Cuba for the period 2012-2013, when in fact it was a sale between Quad Peru and ETECSA, with Quad Peru providing the telephone directories.  The Peruvian Agent was described as an intermediary for the sale and also provided pre-press services.  The Peruvian Agent submitted sham invoices to Quad Peru and received payment in 2012 and 2013.

46.     On March 12, 2012, the Peruvian Agent signed a contract with ETECSA to publish the telephone directories.  The Peruvian Agent then hired Quad Peru as a subcontractor. Quad Peru printed, packaged, and arranged for shipment of the directories to Cuba.  Thus, the Peruvian Agent was simply a pass through to avoid the Legal Department's advice on U.S. sanctions.

47.     From approximately February 18 to 29, 2012, Quad Peru also paid hotel bills for ETECSA employees who visited Peru to review sample telephone directories and oversee the start of the 2012 printing and packaging project.  Additionally, from approximately April 8, 2010, to July 1, 2012, Quad Peru sales representatives also traveled to Cuba multiple times to meet with ETECSA officials to discuss the pending printing project for ETECSA.

48.     Months later in approximately September 2012, during a risk assessment in Peru conducted by the company's compliance group and its external accounting consultants, executives in the U.S. learned about the improper 2012 sale to Cuba.  Despite learning of the sale, executives in the U.S failed to put adequate internal accounting controls and trade compliance measures in place to ensure that no additional work was conducted with ETECSA or other sanctioned countries.  To the contrary, the illegal sale in 2012 was completed with the knowledge and approval of Quad's Operations Executive.

49.     In August 2013, despite knowing by this time that sales to Cuba were prohibited, Quad Peru employees opted to bid on yet another contract with ETECSA for the sale of 2014 telephone directories.  Quad Peru won the bid in September 2013, but subsequently withdrew it in October 2013, because of U.S. sanctions.

50.     The revenue from the 2012 sale to ETECSA was falsely recorded in Quad Peru's books and records as a sale to Peruvian Agent.  Quad's illicit gain on the sale to ETECSA was approximately $200,000.

### Bribery to Secure Sales in China

51.     In addition to the improper conduct in Peru, from 2010 to 2015, bribes were promised and paid by Quad's China based subsidiary, Quad/Tech China, to employees of state owned entities and private customers through sham sales agents to win business.

52.     During the relevant period, Quad/Tech China sold and serviced systems that attached to printing machinery.  The systems were designed to improve the quality and efficiency of printing presses utilized by customers.  Most of Quad/Tech China's customers were Original Equipment Manufacturers ("OEMs") and press end users.  Quad/Tech China's clients were in traditional (*e.g.* newspapers) and packaging printing and its focus was on the packaging side of the market.

53.     Since there were only a handful of OEMs selling printing presses in China and an equally small number of press end users, Quad/Tech China's potential customer base was small.  Sotech Machinery Co. Ltd. ("Sotech"), an OEM specializing in packaging printing equipment, mostly for the cigarette industry, was one of Quad/Tech China's largest customers.  Another large OEM and customer was Shaanxi Beiren ("Shaanxi Beiren") Printing Machinery Co. Ltd., a state owned entity and manufacturer of printing, decorating and packaging machinery.

54.     From at least 2010 to July 2015, Quad/Tech China promised or paid commissions to sales agents who then passed some portion of the payments on to employees of OEMs and end users at private and public companies in China.  The payments were made to induce customers to

10

purchase Quad/Tech China's systems.  Illicit payments were made to Chinese officials at Shaanxi Beiren and to employees of Sotech to win sales.

55.     The fake commissions that Quad/Tech China paid to sales agents to make illicit payments were generally 2% of sales order values and were typically described on invoices as "technical service fees."  The identities of the sham sales agents were kept secret from most Quad/Tech China employees.  They did not provide any bona fide services and were not involved in any business operations at Quad/Tech China.  They simply invoiced Quad/Tech China for a 2% commission and then transferred payment to customer employees in return for Quad/Tech obtaining a contract.

56.     The improper payments were largely facilitated by a former Quad/Tech China Sales Executive in charge of the package printing business in China.  Quad/Tech China's then General Manager and its then Finance Manager were also aware of the payments to the sham sales agents.  All three employees were based in China.

57.     The total amount of improper commissions that Quad/Tech China paid or promised to sales agents in China was approximately $182,000.

58.     Quad/Tech China did not do any due diligence on the sham sales agents and no proof of services performed were provided before their invoices were paid.   Quad failed to provide adequate oversight and auditing of Quad/Tech China.  In addition, Quad/Tech China employees were inadequately trained on the company's anti-corruption policies.  The improper payments were falsely recorded in Quad's books and records as "commissions" and Quad failed to devise and maintain a system of internal accounting controls sufficient to detect or prevent the improper payments.  Quad/Tech China was unjustly enriched by approximately $1,087,322 as a result of the improper payments in China.

## Legal Standards and Violations

59.     Under Section 21C of the Exchange Act, the Commission may impose a cease-and desist order upon any person who is violating, has violated, or is about to violate any provision of the Exchange Act or any rule or regulation thereunder, and upon any other person that is, was, or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to such violation.

60.     As a result of conduct described above in Peru, Quad violated Section 30A of the Exchange Act, which in relevant part makes it unlawful for an issuer with securities registered under Section 12 of the Exchange Act or which is required to file reports under Section 15(d) of the Exchange Act, or any employee or agent acting on its behalf, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an effort to pay or offer to pay anything of value to foreign officials for the purpose of influencing their official decision-making, in order to assist in obtaining or retaining business.  Each Quad subsidiary described above was an "agent" of Quad within the meaning of the Foreign Corrupt Practices Act.

61.     As a result of the conduct described above, Quad violated Section 13(b)(2)(A) of the Exchange Act, which requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of the assets of the issuer.

62.     As a result of the conduct described above, Quad violated Section 13(b)(2)(B) of the Exchange Act, which requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

## Quad's Self-Disclosure, Cooperation, and Remedial Efforts

63.     In determining to accept the Offer, the Commission considered Respondent's self-disclosure, cooperation and remedial efforts.  Quad voluntarily disclosed the misconduct.  The company's cooperation included sharing facts developed during the course of its own internal investigation, producing documents and other materials (including documents from overseas), translating key documents, summarizing findings of internal investigations, providing summaries of witness interviews, and assisting in making current and former employees available for interviews.

64.     Quad's remedial actions included: (i) terminating employees involved in the improper conduct; (ii) enhancing the role and resources within the compliance department; (iii) hiring a new International Trade Compliance Manager; (iv) ongoing recruitment for, and training of, new compliance and internal audit personnel with anti-corruption expertise; (v) completing a root-cause analysis and implementing several internal controls enhancements; (vi) updating its code of conduct to further address FCPA issues; and (vii) updating policies and procedures designed to ensure appropriate risk assessments and integration plans are developed for newly acquired entities.

## Undertakings

65.     Respondent undertakes to:

Report to the Commission staff periodically during a one-year term, the status of its remediation and implementation of compliance measures, particularly as to anti-corruption risk assessments and integration of acquired entities, staffing and budgeting for compliance and internal audit, and due diligence and monitoring of payments to third-parties. During this period, should Respondent discover credible evidence, not already reported to Commission staff, that questionable or corrupt payments or questionable or corrupt transfers of value may have been offered, promised, paid, or authorized by Respondent, or any entity or person acting on behalf of

12

Respondent, or that related false books and records have been maintained, Respondent shall promptly report such conduct to the Commission staff. During this one-year period, Respondent shall: (1) conduct an initial review and submit an initial report and (2) conduct and prepare one follow-up review and report, as described below:

a.  Respondent shall submit to the Commission staff a written report within 180 calendar days of the entry of this Order setting forth a complete description of its FCPA and anti-corruption related remediation efforts to date for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the parameters of the subsequent review (the "Initial Report"). The Initial Report shall be transmitted to Tracy Price, Deputy Chief, FCPA Unit, United States Securities and Exchange Commission, 100 F Street, NE, Washington, DC, 20549-5631. Respondent may extend the time period for issuance of the Initial Report with prior written approval of the Commission staff.

b.  Respondent shall undertake one follow-up review, incorporating any comments provided by the Commission staff on the previous report, to further monitor and assess whether the policies and procedures and remediation efforts of Respondent are reasonably designed and implemented to detect and prevent violations of the FCPA and other applicable anti-corruption laws (the "Follow-Up Report").

c.  The Follow-up Report shall be completed by no later than 180 days after the Initial Report.  Respondent may extend the time period for issuance of the Follow-up Report with prior written approval of the Commission staff.

d.  The periodic reviews and reports submitted by Respondent will likely include proprietary, financial, confidential, and competitive business information. Public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain nonpublic, except (a) pursuant to court order, (b) as agreed by the parties in writing, (c) to the extent that the Commission staff determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (d) is otherwise required by law.

e.  During this one-year period of review, Respondent shall provide its external auditors with its annual internal audit plan and reports of the results of internal audit procedures and its assessment of its FCPA compliance policies and procedures.

f.  During the one-year period of review, Respondent shall provide Commission staff with any written reports or recommendations provided by Respondent's external auditors in response to Respondent's annual internal audit plan, reports of the

13

results of internal audit procedures, and its assessment of its FCPA compliance policies and procedures.

g. Certify, in writing, compliance with the undertaking(s) set forth above. The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. The certification and supporting material shall be submitted to Tracy L. Price, Deputy Chief, FCPA Unit, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Quad's Offer. Accordingly, it is hereby ORDERED that**:**

A.	Pursuant to Section 21C of the Exchange Act, Respondent Quad cease-and-desist from committing or causing any violations and any future violations of Sections 30A, 13(b)(2)(A) and 13(b)(2)(B)  of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B), and 78dd-1].

B.	Respondent shall comply with its Undertakings as enumerated in paragraph 65 above.

C.	Respondent shall, within fourteen days of the entry of this Order, pay disgorgement of $6,936,174, prejudgment interest of $959,160, and a civil penalty of $2,000,000, for total payment of $9,895,334 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment of disgorgement and prejudgment interest is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. If timely payment of the civil penalty is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)	Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)	Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Quad as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Tracy L. Price, Deputy Chief, FCPA Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-5631.

D.     Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that[it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

E.      Respondent acknowledges that the Commission is not imposing a civil penalty in excess of $2,000,000 based upon its cooperation in a Commission investigation and related enforcement action.  If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondent knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondent, petition the Commission to reopen this matter and seek an order directing that the Respondent pay an additional civil penalty.  Respondent may contest by way of defense in any resulting administrative proceeding whether it knowingly provided materially false or misleading information, but may not:  (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

By the Commission.


Vanessa A. Countryman
Secretary

16