**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DENNIS BORN, MARILYNN BORN, and
VALERIE BLOOM, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiffs,

-v-

QUAD/GRAPHICS, INC., J. JOEL
QUADRACCI and DAVID J. HONAN,

                    Defendants.

Case No. 1:19-cv-10376-VEC

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Defendants Quad/Graphics, Inc., J.*
*Joel Quadracci, and David J. Honan*

July 14, 2020

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................1

      A.    Quad's 3.0 Plan.................................................................................4

      B.    The LSC Acquisition .........................................................................6

      C.    3Q19 Results and The End of The Class Period.........................................9

      D.    Quad's Sale of Transpak and SEC FCPA Settlement...............................10

ARGUMENT...........................................................................................................................11

    I.    PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM RELATING TO QUAD'S 3.0 PLAN AND THE LSC ACQUISITION ....................................12

      A.    No False and Misleading Statements or Omissions Regarding the 3.0 Plan ....................................................................................12

      B.    No False and Misleading Statements or Omissions Regarding the LSC Acquisition...............................................................................17

      C.    No Scienter.....................................................................................19

      D.    No Loss Causation ...........................................................................23

    II.    PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM RELATING TO THE USE OF TRANSPAK SALE PROCEEDS ...........................................24

    III.    PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM ...........................25

CONCLUSION.......................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
    2013 WL 144041 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom.*
    *Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013) ....................4

*In re Alcatel Sec. Litig.*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005)........................................................................................12

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)........................................................................................24

*In re Aratana Therapeutics, Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018).................................................................................16, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................................................11, 25

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ..........................................................................19

*In re Avon Prods., Inc. Sec. Litig.*,
    2009 WL 848017 (S.D.N.Y. Feb. 23), *report and recommendation adopted*, 2009 WL
    10698359 (S.D.N.Y. Mar. 18, 2009) ..........................................................................................4

*Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*,
    475 F. App'x 353 (2d Cir. 2012) ..............................................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................11, 24

*In re China Organic Sec. Litig.*,
    2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013)..........................................................................11

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Tech. Corp.*,
    2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) ..........................................................................22

*City of Taylor Gen. Emp. Ret. Sys. v. Magna Int'l Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. 2013)........................................................................................22

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020) (Caproni, J.) ...............................................11, 19, 20, 23

*DPC N.Y., Inc. v. Scottsdale Ins. Co.*,
  2020 WL 2555241 (S.D.N.Y. May 19, 2020) ............................................................................4

*In re Duane Reade Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane
  Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) ......................................................................16

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 185 (2d Cir. 2009).....................................................................................................16

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) .........19

*Fishbaum v. Liz Claiborne, Inc.*,
  1999 WL 568023 (2d Cir. July 27, 1999)................................................................................22

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)......................................................................................15

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................................22

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)...........................14, 15

*Harris v. AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 649 F. App'x 7
  (2d Cir. 2016)..............................................................................................................12, 20, 24

*Hart v. Internet Wire, Inc.*,
  145 F. Supp. 2d 360 (S.D.N.Y. 2001)......................................................................................20

*Holbrook v. Trivago N.V.*,
  2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*,
  796 F. App'x 31 (2d Cir. 2019) .......................................................................13, 14, 17, 18

*In re IPO Sec. Litig.*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v. Credit Suisse First
  Bos. Corp.*, 2006 WL 1423785 (2d Cir. May 19, 2006).............................................................24

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)........................................................................................................22

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)...............................................................................................19, 20

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991)..................................................................................4

*Kuriakose v. Fed Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas
  Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013).................20

*Lentell v. Merrill Lynch & Co. Inc.*,
  396 F.3d 161 (2d Cir. 2005)........................................................................23, 24, 25

*Livingston v. Cablevision Sys. Corp.*,
  966 F. Supp. 2d 208 (E.D.N.Y. 2013) ...................................................................4

*Long Miao v. Fanhua, Inc.*,
  2020 WL 996602 (S.D.N.Y. Mar. 2, 2020) ............................................................21

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)..........................18

*In re MGT Capital Investments, Inc. Sec. Litig.*,
  2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018)..........................................................17

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................................15, 19

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
  951 F. Supp. 2d 479 (S.D.N.Y. 2013)..................................................................15

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom.
  Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)...........................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................16, 17, 19

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)................................................................................23

*P. Stolz Family P'Ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004).................................................................................15

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. 2020)..............................................................14, 16

*Reilly v. U.S. Physical Therapy, Inc.*,
  2018 WL 3559089 (S.D.N.Y. July 23, 2018) .........................................................22

iv

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*,
   333 F. Supp. 3d 338 (S.D.N.Y. 2018)..................................................................................19

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .......................................................................21

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................................................16

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009)..................................................................................................20

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom.*
   *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)....................................................................15

*Schiro v. Cemex, S.A.B. de C.V.*,
   2020 WL 635705 (S.D.N.Y. Feb. 10, 2020)..........................................................................23

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019).............................................................................12, 20

*Singh v. Schikan*,
   106 F. Supp. 3d 439 (S.D.N.Y. 2015)..................................................................................17

*In re Skechers USA, Inc. Sec. Litig.*,
   2020 WL 1233759 (S.D.N.Y. Mar. 12, 2020) .......................................................................21

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)....................................................................................14, 15, 19

*Steinberg v. Ericsson LM Tel. Co.*,
   2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .......................................................................20

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)..................................................................................................11

*Tabak v. Canadian Solar Inc.*,
   549 F. App'x 24 (2d Cir. 2013) ...........................................................................................19

*Tabor v. Bodisen Biotech, Inc.*,
   579 F. Supp. 2d 438 (S.D.N.Y. 2008)..................................................................................12

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................11, 12, 23

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)...................................................................19

*In re Zyprexa Prods. Liab. Litig.*,
   549 F. Supp. 2d 496 (E.D.N.Y. 2008) ....................................................................4

**Statutes and Rules**

15 U.S.C. § 78j.........................................................................................11, 12,  24

15 U.S.C. § 78u-4(b)................................................................................1, 11, 19

15 U.S.C. § 78u-5(c) .......................................................................................14

15 U.S.C. § 78u-5(i)(1)..............................................................................14, 18

Fed. R. Civ. P. 8 ..............................................................................................1

Fed. R. Civ. P. 9(b) .....................................................................................1, 11

Fed. R. Civ. P. 12(b)(6)...............................................................................1, 11

Defendants Quad/Graphics, Inc. ("Quad"), J. Joel Quadracci, and David J. Honan (collectively, the "Individual Defendants," and together with Quad, the "Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss the First Amended Class Action Complaint under Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules") and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3) ("PSLRA").

## PRELIMINARY STATEMENT

Quad, a family-controlled business based in Sussex, Wisconsin, is a leader in the printing business, a challenged industry in a rapidly increasing digital world. To address this, Quad has been undergoing a decades-long, fully disclosed transformation into an integrated marketing services provider with offerings extending beyond print. Quad's transformation plan ("3.0 plan" or "transformation plan") launched in the summer of 2017, and involves strategic investments and acquisitions to expand the Company's services across print and digital channels. In October 2018, Quad announced the acquisition of another "leader in print," LSC Communications ("LSC"), to strengthen the role of print as part of its broader marketing offerings and achieve millions of dollars of hoped-for synergies.

According to the 96-page Amended Complaint ("AC"), during the alleged class period of February 21, 2018 to October 29, 2019 (the "Class Period"), Quad supposedly misled the market by failing to disclose that "the pace of Quad's 3.0 transition needed to be significantly and rapidly accelerated to offset secular declines in the Company's print business." As to the LSC acquisition, Plaintiffs claim that Quad neglected to inform the market that the "true purpose" of the acquisition was to eliminate competition, and misleadingly portrayed its intent to fight a DOJ antitrust suit to block the acquisition, which was ultimately terminated after a federal judge refused Quad and

LSC's joint request for expedited treatment. According to the AC, the "truth" came out about the 3.0 plan and the LSC acquisition on October 29, 2019 when Quad reported disappointing third quarter results, modestly reduced guidance for FY19, and announced strategic decisions to divest its book business, accelerate its transformation plan, and reduce its quarterly dividend to help fund the transformation.

While we have grown accustomed to boilerplate securities fraud complaints without any particularized support, this one ranks high in the offending category. There is *not one* confidential witness, single document, or alleged contemporaneous fact to support a wide-ranging securities fraud. There is *not one* allegation of insider selling, any motive, or conscious misbehavior sufficient to support the required cogent and compelling inference of fraud to overcome the competing inference that Quad honestly and timely described its transformation plan, its challenges, and a hoped-for acquisition that did not come to pass in light of a DOJ action to enjoin it on antitrust grounds. There is no "punch line" disclosure at the end of the Class Period that even comes close to showing any supposed fraud, as opposed to disappointing results. Plaintiffs implicitly acknowledge these pleading deficiencies by stating at the outset that they "believe[]" they will find "substantial evidentiary support" after Plaintiffs have a "reasonable opportunity for discovery." AC at 1. But this turns the PSLRA on its head. Plaintiffs must plead particularized facts showing material misstatements or omissions and the requisite fraudulent intent to survive a motion to dismiss. Plaintiffs' failure to do so, as set forth below, requires the AC's dismissal.

*First*, Plaintiffs offer only a rote repetition of alleged omissions about the pace at which Quad's 3.0 plan needed to proceed to offset secular declines in the Company's print business, and about the "true" reasons for the proposed LSC acquisition and the consequences of terminating the acquisition, including with respect to Quad's FY19 guidance and dividend. Plaintiffs' claims are

based entirely on Quad's disappointing 3Q19 results and announced intention at the time to sell its book business, accelerate its transformation plan, and increase capital for the plan by cutting its dividend earnings. These are business decisions, not proof of securities fraud. And virtually all of the challenged statements concerning the 3.0 plan and the LSC acquisition were forward-looking in nature and protected by the PSLRA safe harbor because the statements were (i) accompanied by meaningful warnings about the go-forward risks and (ii) Plaintiffs plead no actual knowledge that the statements were false when made. *See infra* Parts I.A-B.

*Second*, Plaintiffs' scienter allegations—SOX certifications, the core operations doctrine, and senior management positions—are beyond shopworn and clearly insufficient. Nor have Plaintiffs articulated any motive for the alleged fraud. Every company wants to its stock price to rise. Every company wants its announced transformation plan to succeed. Plaintiffs have no confidential witnesses, point to no insider selling by Defendants, and offer no viable inference of fraud, let alone one that is at least as cogent and compelling as the competing non-fraudulent inference here: Quad terminated the LSC acquisition in light of DOJ opposition and the trial court's rejection of the parties' joint request for expedition, and later reported disappointing 3Q19 results and made strategic decisions to better position itself for the future. *See infra* Part I.C.

*Third*, Plaintiffs have not alleged loss causation, *i.e.*, that the alleged misstatements and omissions caused their losses. *See infra* Part I.D.

*Finally*, as part of a kitchen sink approach to pleading securities fraud, Plaintiffs assert a second supposed fraud that is even more tenuous and unsubstantiated than the first, if that were even possible. Plaintiffs allege that in September 2019, Quad lied when it said it would use proceeds from the nearly $10 million sale of its wood crating business to pay down debt because weeks later, Quad announced a nearly $9.9 million settlement with the SEC of FCPA claims long

3

pre-dating the Class Period. Despite devoting a substantial portion of the AC to the years-old, fully disclosed FCPA claims, Plaintiffs' sole support for this securities fraud claim is the alleged "suspicious timing" of the wood crating business sale and the amount of the FCPA settlement. The easily ascertainable public facts show, however, that Quad had hundreds of millions of dollars of available liquidity to fund the settlement and, in fact, was regularly paying down debt. Nothing supports Plaintiffs' "suspicious timing" theory. Nor do Plaintiffs provide any reason *why* Defendants would have lied about the intended use of the proceeds from the sale when Quad fully disclosed the FCPA settlement and had hundreds of millions of available liquidity to fund that settlement. Apparently, Plaintiffs must believe that focusing on long ago FCPA issues will somehow beef up an AC devoid of any substance. *See infra* Part II.

## STATEMENT OF FACTS[1]

### A.      Quad's 3.0 Plan

Quad was founded in 1971 as a family-owned print business. *See* AC ¶ 35. Over time, the Company engaged in a series of transformation strategies to adapt to the challenges posed by the declining print industry. *See* AC ¶¶ 35-36. This culminated in the recent Quad 3.0 plan, which has transformed Quad into a multi-channel marketing solutions firm that offers a wide range of services and products in digital media and print. *See* AC ¶¶ 2-4.[2] During the Class Period, Quad

---

[1] These facts are drawn from the AC, documents incorporated therein, documents filed with the SEC, and documents relied on by Plaintiff in bringing suit. *See In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *1 n.2 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013). These facts are also drawn from analyst reports and publicly filed court documents in the DOJ action (referenced in the AC at ¶¶ 9-10, 67-69, 71-73, 196), of which the Court may take judicial notice to establish market awareness and the fact of such filings. *See, e.g., In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848017, at *24 n.10 (S.D.N.Y. Feb. 23), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009) (quoting *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008)) (analyst reports), *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 217 n.3 (E.D.N.Y. 2013) (analyst reports), *DPC N.Y., Inc. v. Scottsdale Ins. Co.*, 2020 WL 2555241, at *5 (S.D.N.Y. May 19, 2020) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)) (public court filings).

[2] At all times during the Class Period, Defendant J. Joel Quadracci served as Chairman, President, and Chief Executive Officer ("CEO") and Defendant David J. Honan served as Chief Financial Officer ("CFO") and Executive Vice

disclosed a number of investments and acquisitions with non-print companies to "accelerate" its ongoing 3.0 plan and expand its marketing offerings beyond print. *See*, *e.g.*, AC ¶¶ 139, 142 (Ivie & Associates) ("a leading marketing service provider to further augment our integrated marketing platform"), ¶ 142 (Rise Interactive) ("[o]ur partnership capitalizes on…Rise's expertise in online channels to create more integrated, powerful marketing campaigns"), and ¶ 165 (Periscope) (the combination would "create a truly integrated end-to-end marketing platform" to "create more value than the traditional siloed agency approach").

Plaintiffs repeatedly chant the following mantra after block quoting Quad's disclosures about the 3.0 plan: Defendants allegedly failed to disclose that the "pace of Quad's 3.0 transition needed to be significantly and rapidly accelerated to offset secular declines in the Company's print business." AC ¶ 147; *see also* AC ¶¶ 152, 158, 164, 184, 195, 206. But Quad never promised that 3.0 would completely offset or even keep pace with print industry decline, and Quad repeatedly warned investors about the worsening problems in the print industry. For example, Quad warned:

- the impact of decreasing demand for printed materials and significant overcapacity in the highly competitive commercial printing industry creates downward pricing pressures and potential underutilization of assets (Ex. A (4Q17 and FY2017 Earnings Release dated Feb. 21, 2018) at 3);[3]

- the print segment itself…[is] highly fragmented still, and there's a significant amount of underutilization of capacity from print having to compete against all media channels (Ex. B (1Q18 Earnings Call held on May 2, 2018) at 7);

- factors that could cause actual results to materially differ include…the inability of the Company to reduce costs and improve operating efficiency rapidly enough to meet market conditions…[and] the failure to successfully…complete and integrate

---

President of Quad. AC ¶¶ 1, 24, 25. The Quadracci family owns nearly 93% of the Company's outstanding Class B common stock through the Quad/Graphics Voting Trust, and continues to control more than 50% of the total voting power of the Company's stock. AC ¶ 23.

[3] *See also, e.g.*, Ex. C (2Q18 Earnings Release dated July 31, 2018) at 3 (same); Ex. D (4Q18 and FY2018 Earnings Release dated Feb. 19, 2019) at 3 (same); Ex. E (1Q19 Earnings Release dated Apr. 30, 2019) at 3 (same); Ex. F (2017 10-K dated Feb. 21, 2018) at 1, 15 (similar); Ex. G (2018 10-K dated Feb. 20, 2019) at 1 (similar); Ex. H (2Q19 10-Q dated July 31, 2019) at 48 (similar).

acquisitions and investments (Ex. A (4Q17 and FY2017 Earnings Release dated Feb. 21, 2018) at 3-4);[4]

- significant capital expenditures may be needed to maintain the Company's platform and processes and to remain technologically and economically competitive (Ex. A (4Q17 and FY2017 Earnings Release dated Feb. 21, 2018) at 3);[5]

- when you look at the different product lines we're in, whether it's magazines or retail that are under extreme pressure from being disrupted…we have to deal with volumes that might be under pressure as they have been and will continue to be (Ex. I (4Q17 Earnings Call held on Feb. 21, 2018) at 10-11);

- the printing industry…is in secular decline. (Ex. F (2017 10-K dated Feb. 21, 2018) at 3).[6]

And putting the lie to Plaintiffs' alleged fraud, Quad publicly disclosed during the Class Period that while Quad's investments and acquisitions as part of the 3.0 plan contributed to increased net sales,[7] Quad generally continued to experience organic sales declines in the print business that outpaced gains through its 3.0 plan investments.[8]

### B.    The LSC Acquisition

---

[4] *Supra* n.3; *see also* Ex. F (2017 10-K dated Feb. 21, 2018) at 20 (similar); Ex. G (2018 10-K dated Feb. 20, 2019) at 18 (similar).

[5] *Supra* n.3.

[6] *See also id.* at 15 ("[t]he printing industry continues to experience a reduction in demand for printed materials and overcapacity...there is a sustained and increasing shift of digital substitution by marketers and advertisers...[p]rinting industry revenues may continue to decrease in the future"); Ex. G (2018 10-K dated Feb. 20, 2019) at 16 (same).

[7] *See, e.g.*, Ex. C (2Q18 Earnings Release dated July 31, 2018) at 2 (in 2Q18, net sales increased 5.4% "reflecting the impact of the Ivie & Associates and Rise Interactive investments" pursuant to Quad 3.0); Ex. J (4Q18 Earnings Call held on Feb. 20, 2019) at 3-5 (Quad's integrated services revenue, including Periscope, has grown to "approximately 20% of our total net sales, and represents over 40% growth since 2017," "a result of our Quad 3.0 strategy" and "we continue to build on the transformational momentum"); Ex. E (1Q19 Earnings Release dated Apr. 30, 2019) at 1 (in 1Q19, Quad increased net sales by 3.8% to $1 billion "primarily driven by the acquisition of Periscope"—evidence that the "Quad 3.0 strategy is working" which "is a significant driver behind our best quarterly organic sales performance since 2014").

[8] *See, e.g.*, Ex. K (2Q18 Earnings Call held on Aug. 1, 2018) at 5 ("Net sales…increased 1.1% to $2 billion, while our organic sales declined 3.7%"); Ex. L (3Q18 Earnings Call held on Oct. 31, 2018) at 10 ("Net sales…increased 2.4%...[o]rganic sales declined 3.2%...[O]rganic sales declines were due to ongoing print industry volume and pricing pressures"); Ex. J (4Q18 Earnings Call held on Feb. 20, 2019) at 5 ("Full year 2018 net sales increased 1.5%…and organic sales declined 3.8%"); Ex. M (2Q19 Earnings Call held on July 31, 2019) at 6 ("net sales increased 1.3%...organic sales declined 1.5%").

On October 31, 2018, announced plans to acquire LSC, another leader in print, to bring together "the printing industry's most experienced operators and innovators" (AC ¶¶ 159-60), "strengthen the role of [Quad's print business]… as part of a much larger, more robust integrated marketing solutions offering," and generate "$135 million" in net synergies. Ex. N (Press Release dated Oct. 31, 2018) at 1. While Plaintiffs claim Quad failed to disclose that the supposed "true reason[]" for the acquisition was to eliminate its main competitor (AC ¶ 131), Quad undisputedly disclosed the reasons for the acquisition: it was acquiring a competitor, which would accrete to earnings, reduce costs, and increase "efficiencies" and "flexibility,"[9] the implications of which were readily understood by the market at the time.[10]

When announcing the acquisition, Quad warned that there was no certainty that the transaction would close and that Quad's "actual results" could "differ materially" depending on its ability to complete the acquisition by October 31, 2019 (the drop-dead date) and obtain government approvals on the proposed schedule.[11] These warnings were on mark. On November 13, 2018, the DOJ commenced an antitrust investigation and Quad spent the next eight months fighting for the transaction to proceed by making substantial document productions, submitting to

---

[9] Ex. N (Press Release dated Oct. 31, 2018) at 2.

[10] See, e.g., Ex. O (Sidoti Analyst Report dated Nov. 1, 2018) at 1 ("QUAD announced the acquisition of its #1 competitor"); Ex. P (Buckingham Analyst Report dated Nov. 1, 2018) at 1 ("[W]e have to assume the deal would, over time, have positive ramifications on industry pricing trends"); Ex. Q (Sidoti Analyst Report dated Nov. 6, 2018) at 2 (highlighting the "projected annualized synergies of about $135 million" that would result from the acquisition and that the "combined company is likely to pass along incremental cost efficiencies … to customers"); Ex. R (Sidoti Analyst Report dated Feb. 8, 2019) at 2 (noting "there should be immediate cost and revenue synergies [resulting from the acquisition]" and that "the acquisition will yield transaction-specific distribution and printing efficiencies that will benefit customers, including future volume purchase discounts, which could significantly curb mailing and distribution costs across the U.S. printing supply chain").

[11] Ex. N (Press Release dated Oct. 31, 2018) at 4-5. Quad continued to issue similar warnings after it announced the acquisition. See, e.g., Ex. G (2018 10-K dated Feb. 20, 2019) at 1 (the "factors [that] could cause actual results to differ materially [include]…[t]he failure to successfully…complete and integrate acquisitions and investments, including the proposed acquisition of LSC").

7

many depositions, and submitting multiple briefs.[12] The DOJ filed suit on June 20, 2019 in the United States District Court for the Northern District of Illinois, Eastern Division to block the proposed acquisition of "two significant providers of magazine, catalog, and book printing services." AC ¶ 67.[13] On the same day, Quad said it would "vigorously defend" the lawsuit and continue to fight for the transaction as it had done over the past few months. *See* AC ¶ 72.

Plaintiffs claim that Quad misrepresented the Company's "desire to defend the acquisition in court" based on nothing more than Quad and LSC's subsequent decision to terminate the acquisition on July 23, 2019. *See* AC ¶ 131. However, Plaintiffs ignore the critical intervening event on July 10, when the trial court overseeing the DOJ suit denied Quad and LSC's request to expedite the evidentiary hearing, and set a hearing date well past the acquisition drop-dead date.[14] Unsurprisingly, Quad and LSC subsequently terminated the acquisition, in light of the "added delay, uncertainty, and cost of legal challenges [that] 'would have likely eroded a considerable amount of the expected benefits of the [acquisition].'" *See* AC ¶¶ 73, 196. Plaintiffs allege no facts to support that Quad did not intend to launch a full-throttled defense when the DOJ first sued and, tellingly, omit this key sequence of events from the AC.

Plaintiffs also complain that Quad failed to disclose the consequences of terminating the acquisition, including Quad's ability to achieve its FY19 guidance and maintain its dividend. *See*

---

[12] *See* Ex. S (Joint Mot. to Set Evidentiary Hr'g filed June 26, 2019) at 3-4.

[13] At the time, the market recognized the DOJ's claims that the acquisition could negatively impact market and pricing competition. *See*, *e.g.*, Ex. T (Sidoti Analyst Report dated Dec. 17, 2018) at 1-2 ("The DOJ is reviewing the acquisition…we usually find that the DOJ's main focus…is to ensure that the proposed combination does not impede competition in the long term"); Ex. U (Sidoti Analyst Report dated June 21, 2019) at 1 ("Based on our read of the civil lawsuit court documents…the DOJ is concerned that a combined [Quad and LSC] enterprise would give the new company significantly more pricing power and reduce U.S. commercial printing competition").

[14] Ex. V (Scheduling Order entered July 10, 2019); *see also* Ex. S (Joint Mot. to Set Evidentiary Hr'g filed June 26, 2019); Ex. W (Joint Mot. for Entry of Proposed Scheduling Order filed July 9, 2019).

AC ¶ 131. But Plaintiffs plead no facts to suggest Quad did not believe it could continue to achieve its 2019 fiscal guidance without the acquisition or that it was unable to maintain its dividend.[15]

## C.    3Q19 Results and The End of The Class Period

The Class Period ends on October 29, 2019, when Quad reported lower than expected analyst consensus 3Q19 results for net sales, EPS, and adjusted EBITDA. *See* Ex. X (3Q19 Earnings Release dated Oct. 29, 2019) at 1-2.[16] Various factors drove the results, including the ongoing and fully disclosed print industry volume and pricing pressures, a $24 million impact from a previously disclosed strategic investment to increase employee wages, and a larger-than-expected reduction in the market price for paper byproduct recovery.[17] Quad also announced it was making "bold decisions" to divest its book business and focus on accelerating its transformation through investments to "drive long-term growth and shareholder value." Ex. X (3Q19 Earnings Release dated Oct. 29, 2019) at 1 (internal quotation marks omitted). Quad modestly reduced FY19 full year guidance to reflect the divestiture of the book business and reset its quarterly dividend to provide "additional financial flexibility" to take advantage of growth opportunities and fund the 3.0 plan, among other things. *Id*.

While Plaintiffs allege these disclosures "revealed" the supposed "fraud," and "corrected" past disclosures, they did no such thing. Putting aside Plaintiffs' spin, the 3Q19 earnings release reflected an unexpected downturn in sales and earnings, and a go-forward decision to increase the pace of the 3.0 plan and decrease the dividend to maintain financial flexibility. There was no

---

[15] Quad also expressly warned that the failure to complete the acquisition could impact "the future business and financial results of the Company." Ex. G (2018 10-K dated Feb. 20, 2019) at 30.

[16] Quad's CFO had expressly warned months earlier in July that Quad "expect[ed] to see a year-over-year decline in adjusted EBITDA in the third quarter." Ex. M (2Q19 Earnings Call held on July 31, 2019) at 6.

[17] Ex. Y (3Q19 Earnings Call held on Oct. 30, 2019) at 6-7; *see also* Ex. J (4Q18 Earnings Call held on Feb. 20, 2019) at 10 ("One of the bigger investments we made…was in starting wages in our facilities…[t]hat's not going to have an immediate impact on productivity").

restatement of past results, no admission of wrongdoing, and certainly nothing to suggest that these announced decisions had in fact been made at the outset of the Class Period 18 months earlier and not disclosed for some unknown reason. Nothing in these disclosures suggest Defendants knew, but failed to previously disclose that the 3.0 plan was not moving fast enough or the "true" reasons for the proposed LSC acquisition and the consequences of termination.

### D.      Quad's Sale of Transpak and SEC FCPA Settlement

Plaintiffs allege a second unrelated theory of securities fraud, based solely on Quad's statement on September 4, 2019 that it intended to use the nearly $10 million proceeds from the sale of its industrial wood crating business ("Transpak") to pay down debt. *See* AC ¶¶ 37, 205. According to the AC, this statement was false because Quad "suspicious[ly]" announced three weeks later on September 26, 2019 that it settled a nearly four-year-long FCPA investigation by the SEC involving certain foreign subsidiaries for nearly the same amount of the Transpak sale— $9.9 million. *See* AC ¶¶ 12, 207; *see also* Ex. Z (SEC FCPA Order filed Sept. 26, 2019) at 14. Plaintiffs then embark on an over 10-page FCPA detour, repeating in minute detail the publicly available allegations that long pre-date the Class Period, even though they are wholly irrelevant to Plaintiffs' securities fraud claim.[18]

Plaintiffs offer nothing but speculation to "call[] into question" whether the Transpak sale proceeds were, in fact, used to pay down debt as disclosed. *See* AC ¶ 12. Plaintiffs also ignore the publicly disclosed facts demonstrating that Quad regularly paid down debt and had plenty of

---

[18] Plaintiffs' tortured recitation also conveniently ignores that Quad (i) self-reported and launched an internal investigation (Ex. AA (1Q16 10-Q dated May 4, 2016) at 14), (ii) had robust disclosures related to the matter (*See, e.g.*, Ex. BB (2016 10-K dated Feb. 22, 2017) at 99), (iii) implemented remedial efforts (Ex. Z (SEC FCPA Order filed Sept. 26, 2019) at 12), and (iv) neither admitted nor denied the allegations in agreeing to the settlement (*Id.* at 14). The DOJ also declined to bring any action against Quad, citing the Company's "voluntary and prompt self-reporting, cooperation and full remediation." Ex. CC (3Q19 10-Q dated Oct. 30, 2019) at 22.

liquidity ($748.1 million under a revolving credit arrangement as of October 30, 2019)[19] to fund the nearly $9.9 million FCPA settlement.

## ARGUMENT

To survive dismissal under Rule 12(b)(6), Plaintiffs must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), so a complaint offering nothing more than "labels and conclusions" will not suffice. *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *6 (S.D.N.Y. Sept. 30, 2013).

To state a claim under Section 10(b) of the 1934 Securities Exchange Act, Plaintiffs must plead that "each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (internal quotation marks omitted). Under the heightened PSLRA pleading standards and Rule 9(b), a private securities complaint alleging a material misstatement or omission must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (Caproni, J.) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).

The PSLRA also requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.*, scienter or "'intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319,

---

[19] Ex. CC (3Q19 10-Q dated Oct. 30, 2019) at 79.

321 (2007) (quoting 15 U.S.C. § 78u–4(b)(2)). To determine whether Plaintiffs have raised a "strong inference" of scienter, courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Id.* at 324. A strong inference is shown "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Id.*

Although a court must accept as true all well-pleaded allegations of fact, Plaintiffs must plead "sufficient factual matter 'to raise a right to relief above the speculative level,'" *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 168 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 649 F. App'x 7 (2d Cir. 2016), and the court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 294 (S.D.N.Y. 2019) (Caproni, J.) (internal quotation marks omitted). Plaintiffs' nearly 100-page, 268-paragraph AC consists mostly of block quotes from virtually all of Quad's quarterly earnings releases, SEC filings, and associated investor calls during the Class Period, followed by a mechanical repetition of conclusory general allegations as to why all of Quad's statements were false and/or omitted information rendering them misleading. *See* AC ¶ 147, 152, 158, 164, 184, 195, 206. Courts in this Circuit have soundly rejected this sort of "laundry list" pleading approach.[20]

As discussed below, Plaintiffs fail to state a claim for securities fraud under Section 10(b) with respect to either (i) the challenged statements concerning Quad's 3.0 plan and the LSC acquisition or (ii) the intended use of the Transpak sale proceeds.

I.    **PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM RELATING TO QUAD'S 3.0 PLAN AND THE LSC ACQUISITION**

      A.    **No False and Misleading Statements or Omissions Regarding the 3.0 Plan**

---

[20] *See, e.g.*, *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005).

First, Plaintiffs challenge nearly every statement about Quad's 3.0 plan over the nearly two-year Class Period, including (i) its intention to accelerate the 3.0 plan (*e.g.*, "we will … continue to accelerate Quad 3.0"; "we remain focused on our … strategic priorities to continue to accelerate our Quad 3.0 transformation");[21] (ii) its planned acquisitions and investments as part of the transformation plan (*e.g.*, "we take a disciplined build, partner, acquire approach to accelerate our [3.0] transformation"; "the Company intends to…pursue value-driven…acquisitions that help accelerate the Company's transformation in Quad 3.0");[22] and (iii) the ability of the 3.0 plan to help offset the declining print business (*e.g.*, "With these [strategic] investments [as part of 3.0 plan], our offering further extends beyond print"; "We anticipate 2019 net sales to...include[] continued downward pressure on print sales…partially offset by the impacts from…continued growth in incremental Quad 3.0 revenues").[23]

The crux of Plaintiffs' sweeping attack is that Quad "failed to disclose that the pace of Quad's 3.0 transition needed to be significantly and rapidly accelerated to offset secular declines in the Company's print business." *See* AC ¶¶ 147, 152, 158, 164, 184, 195; *see also* ¶ 206 (similar). The implication is that Quad had material information regarding the pace of the 3.0 plan that was not disclosed and rendered Quad's disclosures misleading. But there is not one particularized, non-conclusory allegation in the AC to support this core contention. There are no alleged confidential witness statements, contemporaneous internal documents, or any particularized facts demonstrating that Quad was in possession of such information—or that such information existed at all. *See Holbrook v. Trivago N.V.*, 2019 WL 948809, at *18 (S.D.N.Y. Feb. 26, 2019) (no

---

[21] AC ¶¶ 151, 156.

[22] AC ¶¶ 151, 154, 162, 171, 200; *see also* AC ¶¶ 138-39, 140, 143, 148, 165-66, 176, 180.

[23] AC ¶¶ 176-77; *see also* AC ¶¶ 139, 142.

omission where plaintiffs failed to explain "how further disclosure of facts known or knowable" at time of challenged statement "was necessary to correct a false impression"), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019). Defendants never made any promises (and Plaintiffs point to none) that the 3.0 plan would outpace or match dollar-for-dollar print revenue declines. In fact, Quad repeatedly disclosed that the 3.0 plan investments were not completely offsetting declines in organic (legacy print) sales. *Supra* nn.7-8.

Moreover, many of the challenged statements concerning the hoped-for success of the ongoing transformation are forward-looking statements protected by the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c). Framed in the disjunctive, the safe harbor applies if a statement is "identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). The challenged statements about Quad's intentions for its 3.0 plan and predictive statements regarding the anticipated results are indisputably forward-looking,[24] were identified as such,[25] and were accompanied by "meaningful cautionary language." *Slayton*, 604 F. 3d at 771-72. Indeed, as discussed,[26] Quad repeatedly warned investors of the very risks Plaintiffs allege to have materialized, including the pace of the print industry decline. *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 405

---

[24] Forward-looking statements are defined to include, *inter alia*, "future economic performance," "a projection of revenues, income…[or] earnings," and "plans and objectives of management for future operations." 15 U.S.C. § 78u-5(i)(1). *See also Slayton*, 604 F.3d at 769 (statement is "plainly forward-looking" if "it projects results in the future"); *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 354-55 (S.D.N.Y. 2020) ("forward-looking statements are 'statements whose truth cannot be ascertained until some time after they are made'").

[25] Quad's press releases and SEC filings, including those discussing the 3.0 plan, specifically cautioned that they contained "'forward-looking statements' within the meaning of the [PSLRA]" including "current expectations about the Company's future results, financial condition, revenue, earnings, free cash flow, margins, objectives, goals, strategies, beliefs, intentions, plans, estimates, prospects, projections and outlook of the Company . . . ." *See, e.g.*, Ex. A (4Q17 and FY17 Earnings Release dated Feb. 21, 2018) at 3; Ex. DD (2Q18 10-Q dated Aug. 1, 2018) at 43 (similar); Ex. G (2018 10-K dated Feb. 20, 2019) at 1 (similar); Ex. H (2Q19 10-Q dated July 31, 2019) at 48 (similar).

[26] *Supra* pp. 5-6.

14

(S.D.N.Y.) (risk disclosures are meaningful where they warn of "precise risks" that "eventually materialized"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). Quad's warnings were far from "boilerplate" (*see* AC ¶ 248), as they "relate directly to that by which the plaintiffs claim to have been misled," thus bringing the statements within the safe harbor. *P. Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) (citation and internal quotation marks omitted); *see also Slayton*, 604 F.3d at 772.

While this is sufficient to end the inquiry, Plaintiffs also fail to demonstrate *actual knowledge* of the falsity of any forward-looking statement—a standard "stricter than for statements of current fact." *Slayton*, 604 F.3d at 773 (quotations omitted). As discussed, Plaintiffs do not plead a single non-conclusory fact demonstrating that Defendants knew at the time of the challenged forward-looking statements that "the pace of Quad's 3.0 transition needed to be significantly and rapidly accelerated to offset secular declines in the Company's print business." *See* AC ¶¶ 147, 152, 158, 164, 184, 195; *see also* ¶ 206 (similar). That Quad's 3Q19 results were worse than analysts expected and Quad decided to sell its book business to focus on the 3.0 plan does not show actual knowledge by Defendants that any prior forward-looking statements were false when made.[27] Indeed, "[c]orporate officials need not be clairvoyant…allegations that defendants should have anticipated future events" are insufficient. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

Several challenged statements also reflect Defendants' beliefs about Quad's growth prospects under the 3.0 plan (*e.g.*, "we *think* we'll grow long term [in packaging];" "the Company

---

[27] *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (no actual knowledge absent "allegations of concrete facts that put defendants on notice" that timely FDA approval was unlikely), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589-91 (S.D.N.Y. 2016) (same); *see also Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497-98 (S.D.N.Y. 2013) (no misstatement where complaint identified "no internal reports possessed by defendants," employee communications, or "accounts from confidential witnesses" showing "defendants knew of and disregarded" contradictory information undermining prior reserve adequacy statements).

*believes* it can maintain the strongest, most efficient print manufacturing platform and remain the high-quality, low-cost producer"; "we *expect* year-over-year growth due to increased synergies from acquisitions and revenues in our Quad 3.0 integrated services offering").[28] None of these opinion statements are actionable because Plaintiffs fail to plead any facts indicating that "the speaker did not hold the belief she professed," "the supporting fact[s] she supplied were untrue," or that Defendants omitted a "material fact" rendering the statement misleading. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194 (2015).

Finally, Plaintiffs challenge a number of optimistic statements about Quad's strategic acquisitions and investments under the 3.0 plan, including its "'disciplined build, partner, acquire approach'" and that newly-acquired Periscope brings its "'world-class capabilities'" to Quad and will "*turbocharge*" Quad's "existing offering" (AC ¶¶ 151, 165, 176). These are simply declarations of "corporate optimism" that are "'immaterial as a matter of law.'"[29] *Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004); *see Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) ("vague[] and enthusiastic[]" statements describing company's "performance, expectations of business success…do not give a reasonable investor meaningful information on which to rely"), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019); *Aratana*, 315 F. Supp. 3d at 758 (statements that

---

[28] *See*, *e.g.*, AC ¶¶ 146, 170, 190 (emphasis added).

[29] Courts have found many similar statements to be inactionable puffery. *Compare*, *e.g.*, AC ¶¶ 165, 176 (Periscope's "world-class capabilities") *with Philip Morris*, 437 F. Supp. 3d at 350 ("draw[ing] upon a team of world-class scientists"); AC ¶¶ 171, 188 (noting "[d]isciplined acquisitions" and a "disciplined approach" to accelerate 3.0 plan) *with ECA & Local 134 IBEW Joint Pension Tr. of Chi. V. JP Morgan Chase Co.*, 553 F.3d 185, 205-06 (2d Cir. 2009) (statements noting "highly disciplined" risk management processes); AC ¶ 138 ("We have made great progress" with 3.0 plan) *with In re Aratana Therapeutics, Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (Company made "remarkable progress" toward commercialization goal); AC ¶¶ 151, 156, 159, 167 (noting "confiden[ce]" in 3.0 plan); *with In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416 at *5 (S.D.N.Y. Nov. 25, 2003) ("[W]e…remain confident in our ability to achieve our sales and earnings targets"), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004).

simply place a "'positive spin on developments'" are neither material nor actionable).[30] Plaintiffs have thus failed to plead any misstatement or omission with respect to the 3.0 plan.

### B. No False and Misleading Statements or Omissions Regarding the LSC Acquisition

Plaintiffs also challenge statements relating to Quad's planned LSC acquisition. Plaintiffs first claim that Quad omitted that the "true reason" for the acquisition was to eliminate a competitor, repeating numerous allegations from the DOJ's antitrust complaint. *See* AC ¶ 131; *see also* AC ¶¶ 67-71. But as discussed, Quad fully disclosed the reasons for the acquisition, including "'the compelling opportunity for the achievement of the $135 million in net synergies…in less than two years through the elimination of duplicative functions, capacity realization, greater operational efficiencies and greater efficiencies in supply chain management'" and that it was expected "'to fuel [Quad's] 3.0 transformation.'" *See* AC ¶¶ 161, 167; *supra* pp. 6-7. Nor do the antitrust allegations cited in the AC show that the "true" undisclosed reason for the acquisition was to eliminate price competition as opposed to the myriad expressly disclosed benefits.[31] Quad also had no obligation to negatively mischaracterize its reason for the acquisition.[32] Regardless, while Quad disputed the allegations, the DOJ's June 20, 2019 public complaint clearly spelled out its

---

[30] Plaintiffs also appear to challenge a few statements regarding the prospects for Quad's book business. *See, e.g.*, AC ¶ 145 ("And so we see the book world as…everyone thought they were going away. They're certainly not when you look at the growth"), ¶ 146 ("But the book areas, actually growth"), ¶ 157 ("books is a great story for the industry" and "continues to grow"), ¶ 192 ("books has been a better story as of late"). Like the opinions about the 3.0 plan, Plaintiffs' paltry allegations also fail to meet the *Omnicare* standard for an actionable statement of opinion. *See Omnicare*, 575 U.S. at 185-86, 194.

[31] *See Singh v. Schikan,* 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015) (disclosures not required to use "phrasing that plaintiffs would have wished"); *see also Holbrook*, 2019 WL 948809, at *19 (declining to "substitute plaintiffs' own 'linguistic preference[s]' for those of the Company's and…'attribute to investors a child-like simplicity' by presuming their incapacity to comprehend the basic meaning of plain English terms") (alteration in original).

[32] *See Singh*, 106 F. Supp. 3d at 448 ("companies need not depict facts in a negative or pejorative light…to have made adequate disclosures"); *In re MGT Capital Investments, Inc. Sec. Litig.*, 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) ("Companies need not draw negative inferences or characterize their behavior in a pejorative way in order to comply with the securities laws").

17

concerns regarding potential future price competition in the market—a fact readily appreciated by investors. *Supra* n.13.

Plaintiffs next suggest that Quad misrepresented its intention to defend the DOJ antitrust suit on June 20, 2019[33] because on July 23, 2019, Quad and LSC terminated the acquisition. But Plaintiffs omit that Quad *was* in fact vigorously defending the antitrust claim from the time the DOJ announced an investigation in November 2018, through the lawsuit filing on June 20, and after, when Quad and LSC filed a motion to set an expedited evidentiary hearing. *Supra* pp. 7-8. Unsurprisingly, after the trial court denied the motion on July 10 and set a hearing date well after the acquisition drop-dead date, Quad and LSC terminated the acquisition because of the disclosed "additional delay" and concomitant legal costs that would supplant the expected benefits of the acquisition. *Supra* p. 8. Plaintiffs plead no internal facts contradicting Quad's public disclosures. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("absent allegations of "*contemporaneous* falsity, there can be no fraud"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Finally, Plaintiffs allege Quad failed to disclose the real consequences of terminating the acquisition, including Quad's ability to achieve its 2019 guidance and maintain its dividend, thus rendering its public statements misleading (*e.g.*, "we remain on track to achieve our full-year 2019 guidance"; "The significant and consistent free cash flow-generating power of our business allows Quad to maintain an affordable and sustainable dividend of $1.20 per share").[34] Plaintiffs have once again alleged nothing—no witness, no document, no other source of contrary information— to show that any statements affirming its FY19 guidance or stating its expected future dividend

---

[33] AC ¶ 72 ("We are fully committed to defending the DOJ's lawsuit in court"); *see also* AC ¶ 131.
[34] AC ¶¶ 198, 204.

were false when made. *See Holbrook,* 2019 WL 948809, at *18.[35] These were also quintessential forward-looking statements[36] shielded by the PSLRA safe harbor because they were accompanied by meaningful cautionary language[37] and for which, alternatively, Plaintiffs plead no actual knowledge by Defendants that they could not achieve guidance or maintain the dividend. *See Slayton,* 604 F.3d at 773, *Novak,* 216 F.3d at 309. Plaintiffs' allegations, devoid of any particularized facts, also fail to meet the *Omnicare* standard for pleading an actionable statement of opinion. *See Omnicare,* 575 U.S. at 185-86, 194.

### C.    No Scienter

Plaintiffs also have not come close to demonstrating the required "strong inference" that Defendants acted with scienter. 15 U.S.C. § 78u-4(b)(2). Plaintiffs' sole alleged "motive"—that Defendants desired to "artificially inflate the Company's stock price" (AC ¶ 238)—is insufficient as a matter of law. Motives must "entail concrete [personal] benefits," *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quotations omitted), so motives "generally possessed by most corporate directors and officers" (*Id.*)—such as an alleged desire for a higher stock price—cannot meet the PSLRA's high burden. *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28-29 (2d Cir. 2013); *see*

---

[35] The fact that LSC—a separate business that was not going through a multi-year transformation plan—reduced its guidance post-termination (*see* AC ¶¶ 10, 73) does not mean Quad did not reasonably believe it could continue to perform as expected. *See Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*, 333 F. Supp. 3d 338, 352 (S.D.N.Y. 2018) (competitors' different decision has no bearing on "information about Defendants' conduct or knowledge" and "shows nothing more than…different business judgment"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 347 (S.D.N.Y. 2011) (fact that company's "practices were distinguishable from their competitors in some ways…is not fraud, especially when Defendants made no attempt to represent otherwise").

[36] Forward-looking statements expressly include "statement[s] of future economic performance," revenue and income projections, and dividends. 15 U.S.C. § 78u-5(i)(1). *See also In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018) ("we remain on track to deliver adjusted EBITDA in line with expectations" protected by PSLRA safe harbor), *aff'd*, 764 F. App'x 127 (2d Cir. 2019); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) (same); *Slayton*, 604 F.3d at 769 ("expect" generally indicates a forward-looking statement), *see supra* pp. 14-15.

[37] *Supra* nn.11, 15.

*CBS Corp.*, 433 F. Supp. 3d at 544 n.16 (Caproni, J.) (rejecting generalized motive and recklessness allegations).

When Plaintiffs fail to plead motive, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be "'correspondingly greater.'" *Schiro*, 396 F. Supp. 3d at 300 (Caproni, J.) (quoting *Kalnit*, 264 F.3d at 142). Recklessness in the context of securities fraud is a state of mind "approximating actual intent" insofar as the "*danger was either known…or so obvious that [Defendants] must have been aware of it.*" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted). Claiming that Defendants "'ought to have known'" is insufficient to allege recklessness. *Kuriakose v. Fed Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012) (quoting *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001)), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013). Nor is recklessness "merely enhanced negligence." *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *12 (S.D.N.Y. Dec. 10, 2008) (internal quotation marks omitted). Plaintiffs' allegations are plainly insufficient.

***Conclusory Allegations that Defendants "Knew."*** Plaintiffs make conclusory allegations that Defendants "knew" of allegedly undisclosed information that rendered their statements false and misleading. *See*, *e.g.*, AC ¶¶ 152, 206, 228. But nowhere do Plaintiffs allege what material contemporaneous contradictory information was omitted, much less identify the "'reports or statements containing this information,'" when it was available to Defendants, or how it contradicted Defendants' public statements—let alone to what extent or effect. *Harris*, 135 F. Supp. 3d at 176. As this court has held, such "broad allegations that Defendants 'knew'…lack[] the specificity required to plead a securities fraud claim." *Id.*

20

***The Individual Defendants' Corporate Positions.*** Plaintiffs allege the Individual Defendants' senior positions gave them "access to material, adverse, non-public information concerning Quad." AC ¶ 27. Although Plaintiffs promise to discuss this purported information "in detail," they never do. *Id.* As this court has repeatedly recognized, "it is practically hornbook law that 'accusations'…'founded on nothing more than a defendant's corporate position are entitled to no weight.'" *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (collecting cases); *In re Skechers USA, Inc. Sec. Litig.*, 2020 WL 1233759, at *18 (S.D.N.Y. Mar. 12, 2020) ("high-level positions are insufficient to plead scienter").

***The Individual Defendants' SOX Certifications***. Plaintiffs also allege that the Individual Defendants' signatures on the Sarbanes-Oxley ("SOX") certifications accompanying Quad's SEC filings throughout the Class Period are probative of scienter. *See* AC ¶¶ 218–19. But it is well established that SOX certifications cannot raise an inference of fraudulent intent unless the AC also "alleges specific contrary information…of which the certifying defendant had 'reason to know.'" *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008); *see also Long Miao v. Fanhua, Inc.*, 2020 WL 996602, at *23 (S.D.N.Y. Mar. 2, 2020) (TABLE). No such "contrary information" has been alleged here.

***Mr. Quadracci's "Extensive Control" Over Quad.*** Plaintiffs allege that Mr. Quadracci's "roles as chairman of the board, Company president, and as trustee of the Quad Voting Trust" and his sister's role as a trustee of the Quad Voting Trust provide "indicia of his Class Period scienter." AC ¶ 225. First, allegations of control alone prove nothing.  Every CEO can be said to exert control. And Plaintiffs nowhere explain why Mr. Quadracci's relationship with his sister supports a

21

showing of scienter. There is also no allegation that Mr. Quadracci—or Mr. Honan—sold shares during the Class Period, thus negating any inference of scienter.[38]

*The Importance of Quad's Print Business and 3.0 Plan*. Plaintiffs also rely on the core operations doctrine to allege that Defendants must have been aware of their omissions and misstatements about the 3.0 plan and the LSC acquisition "[g]iven the importance of Quad's print business and…the Quad 3.0 transition." AC ¶ 230, *see also* AC ¶¶ 228-29. Putting aside the ongoing question of whether the doctrine has any viability in this Circuit,[39] an allegation that the print business was important is, without more, a "naked assertion" that is "plainly insufficient" to satisfy the heightened pleading standard for scienter. *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020).[40]

*Quad's "Historically Weak" Internal Controls*. Defendants' alleged "awareness" of Quad's "historically weak internal controls" relating to the pre-Class Period accounting and anti-corruption allegations in the fully disclosed FCPA settlement are also insufficient to raise an inference of scienter with respect to Plaintiffs' securities fraud claim. The AC implicates no internal control issues regarding accounting or anti-corruption issues. The challenged statements have nothing to do with internal controls and concern Quad's 3.0 plan and the LSC acquisition.

---

[38] *See*, *e.g.*, *City of Taylor Gen. Emp. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013) (no scienter where stock sales are not "calculated to maximize the personal benefit from undisclosed inside information") (quotation omitted); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) (no scienter "where no trades [by defendants] occur in the months immediately prior to a negative disclosure"); *Fishbaum v. Liz Claiborne, Inc.*, 1999 WL 568023, at *4 (2d Cir. July 27, 1999) (no scienter where "the timing of the insider sales did not closely coincide with alleged false statements"); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) ("It defies reason" and "raises precisely the contrary inference from [fraud]" that a person would "hold close to ninety percent of [their] shares as share prices fell" upon revelation of the fraud).

[39] *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Tech. Corp.*, 2020 WL 1529371, at *28 (S.D.N.Y. Mar. 30, 2020) (noting that the core operations doctrine does not provide an independent basis for scienter and that courts in the Second Circuit "have expressed doubts as to [the doctrine's] continuing import") (internal quotations omitted).

[40] *See Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011) (allegations involving "key products" were not "independently sufficient to raise a strong inference of scienter"), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).

In sum, whether taken individually or viewed holistically, Plaintiffs' scienter allegations do not come close to satisfying the *Tellabs* test requiring particularized facts demonstrating an inference of fraud that is at least as "cogent and compelling" as the competing inference of non-fraudulent conduct. *Tellabs*, 551 U.S. at 324.[41] Overall, Plaintiffs accuse Defendants of orchestrating a financially harmful fraud so Defendants could *temporarily* maintain Quad's stock price, but Defendants are not alleged to have profited by selling at the allegedly inflated price, completing a transaction using inflated shares, or any other concrete means. What was the purpose of this supposed fraud? Plaintiffs have no answers and no theory that measures up against the obvious non-fraudulent inference: Quad honestly and timely described its 3.0 plan, its challenges, and a hoped-for acquisition which did not come to pass in light of the DOJ action, reported disappointing 3Q19 results, and made strategic decisions to better position itself for the future.

## D.    No Loss Causation

Plaintiffs also fail to plead loss causation, which requires Plaintiffs to allege "'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted).[42] While Plaintiffs allege that they suffered losses following Quad's October 29, 2019 disclosure (*see* AC ¶¶ 239-40), nothing in that disclosure revealed that Quad's prior statements regarding the 3.0 plan or the LSC acquisition were false or misleading, as it must in order to show loss causation. *See Lentell*, 396

---

[41] Plaintiffs' allegations are paltry, even compared to other complaints dismissed by this Court that at least attempted to show the "who, what, when, where, and how" of the fraud through confidential witness statements or alleged contemporaneous contradictory information. *See Schiro v. Cemex, S.A.B. de C.V.*, 2020 WL 635705, at *2-3 (S.D.N.Y. Feb. 10, 2020) (Caproni, J.) (dismissing complaint where plaintiffs articulated a fraudulent scheme, unlike here); *CBS Corp.*, 433 F. Supp. 3d at 546-47 (Caproni, J.).

[42] Plaintiffs may establish loss causation by alleging (i) "that the market reacted negatively to a corrective disclosure of the fraud;" or (ii) that the loss was "'caused by the materialization of the risk concealed by the fraudulent statement.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010). They fail to do so under either theory.

F.3d at 175. There was no revelation that the 3.0 plan "needed to be significantly and rapidly accelerated to offset secular declines in Quad's print business"—nor had Quad ever promised it would. *See* AC ¶ 147.  And nothing on October 29 revealed that Quad lied about the reasons for the LSC acquisition, Quad's intention to defend the antitrust suit, or that lowering the dividend was a result of terminating the acquisition. Plaintiffs thus fail to establish the "necessary causal link" between the alleged fraud and their losses. *See Lentell*, 396 F.3d at 175. Plaintiffs allege only that Quad's stock fell upon disclosure of bad news, which does not suffice.[43]

## II.   PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM RELATING TO THE USE OF TRANSPAK SALE PROCEEDS

Plaintiffs' second theory of fraud is admittedly based on speculation and can be easily dismissed for failure to satisfy any element of a 10(b) claim. Plaintiffs allege Defendants lied on September 4, 2019 when Quad announced the sale of Transpak and said it would use the nearly $10 million sale proceeds to pay down debt. *See* AC ¶¶ 205-07. Plaintiffs hypothesize that the proceeds were not intended to pay down debt because about three weeks later, Quad settled with the SEC an FCPA investigation concerning pre-Class Period events for about $9.9 million. *Id.*

Plaintiffs identify no confidential witness statement or other particularized information, or any "corrective" disclosure, revealing that Quad did not intend to use the Transpak sale proceeds to pay down debt, did not use the proceeds to pay down debt, or that Quad used the proceeds to settle the FCPA claims. *See Twombly*, 550 U.S. at 545 (allegations must "raise a right to relief above the speculative level"); *Harris*, 135 F. Supp. 3d at 160, 170 (Caproni, J.) (dismissing complaint based on "'sheer speculation' unsupported by factual allegations"). Instead, Plaintiffs

---

[43] *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678-79 (S.D.N.Y. 2007) ("the mere failure to meet earnings forecasts is insufficient to establish loss causation"); *In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) ("failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect"), *aff'd sub nom. Tenney v. Credit Suisse First Bos. Corp.*, 2006 WL 1423785 (2d Cir. May 19, 2006).

repeat, in over 50 paragraphs, all of the underlying FCPA allegations that have nothing to do with the use of the Transpak sale proceeds or the settlement of the FCPA claims.  The publicly available information puts the lie to Plaintiffs' unsupported speculation. Quad, which regularly paid down its debts, indisputably and as a matter of public record, had plenty of liquidity on hand at the time of the FCPA settlement and thus did not have any need to use the Transpak sale proceeds to settle with the SEC as Plaintiffs surmise. *Supra* pp. 10-11. And Plaintiffs make no attempt to articulate *why* Defendants would lie about the use of the proceeds or assert any allegations of fraudulent intent, even under a recklessness theory. That is because the purported "fraud" is implausible.[44]

Plaintiffs put the nail in the coffin of this claim by failing to allege anywhere in the AC that the alleged misstatement about the use of the Transpak sale proceeds caused any loss—nor could they because there was no "revelation" that the proceeds were not used to pay down debt and used instead to settle with the SEC, let alone a revelation that caused a stock decline. For this reason alone, the claim can be dismissed. *See Lentell*, 396 F.3d at 175.[45]

III.     **PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM**

Because Plaintiffs have failed to plead an underlying primary violation or any "culpable participa[tion]" by the Individual Defendants for all the reasons stated above, Plaintiffs have failed to plead a control person claim under Section 20(a). *See ATSI*, 493 F.3d at 108.

**CONCLUSION**

For the foregoing reasons, the AC should be dismissed in its entirety and with prejudice.

---

[44] To the extent Plaintiffs rely on the rote scienter allegations discussed *supra* Part I.C., they fail for the same reasons.

[45] Plaintiffs also challenge a February 21, 2018 statement that Quad believed it would grow in the packaging business because a year later it sold Transpak and had failed to disclose that " its packaging business was a "non-core asset[]" that Quad was "willing to sell to support Quad 3.0." AC ¶¶ 146-47. Even putting aside that a sale of a packaging business a year after this statement was made does not render the statement false and misleading, Plaintiffs conflate Transpak with Quad's larger packaging business. Quad continued to own a packaging business after the Transpak sale. Ex. EE (Press Release dated Sept. 4, 2019) at 1 ("Quad continues to own and operate the former Proteus Packaging Business, which is now part of Quad's nationwide consumer print packaging platform").

Dated: New York, New York
       July 14, 2020

Respectfully submitted,

/s/ Joseph S. Allerhand
Joseph S. Allerhand
Stacy Nettleton
Nicole E. Prunetti
Tania C. Matsuoka
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants Quad/Graphics, Inc., J. Joel Quadracci, and David J. Honan*

26