UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| DENNIS BORN, MARILYNN BORN, and VALERIE BLOOM, Individually and on Behalf of All Others Similarly Situated, | x<br>:<br>:<br>: | Civil Action No. 1:19-cv-10376-VEC<br><br>CLASS ACTION |
| Plaintiffs, | :<br>:<br>: | **LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION** |
| vs. | :<br>:<br>: | **TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |
| QUAD/GRAPHICS, INC., J. JOEL QUADRACCI and DAVID J. HONAN, | :<br>:<br>: | |
| Defendants. | :<br>:<br>: | |
| | x | |

**TABLE OF CONTENTS**

                                                                                              **Page**

I.     INTRODUCTION ...............................................................................................1

II.    BACKGROUND ................................................................................................2

III.   APPLICABLE LEGAL STANDARDS ...........................................................5

IV.    THE COMPLAINT ADEQUATELY PLEADS MATERIALLY FALSE OR
       MISLEADING STATEMENTS AND OMISSIONS .........................................7

       A.    The Complaint Pleads Actionable Misstatements and Omissions...........8

             1.    Defendants Misrepresented and Omitted Facts Regarding the Quad
                   3.0 Transition and the Status of Quad's Business.......................9

             2.    Defendants Misrepresented and Omitted Material Facts Regarding
                   the LSC Acquisition and the Company's 2019 Financial
                   Performance and Outlook ...........................................................13

             3.    Defendants Made False and Misleading Statements Concerning the
                   Transpak Sale ...............................................................................17

       B.    Defendants' Misstatements and Omissions Are Material.....................18

             1.    Defendants' Statements Are Not Corporate Optimism or Puffery ...........18

             2.    The PSLRA's Safe Harbor Does Not Protect Defendants.........19

             3.    Defendants' Purported Opinion Statements Are Actionable .....21

V.     THE COMPLAINT ADEQUATELY PLEADS SCIENTER .........................23

       A.    Plaintiff's Allegations Give Rise to a Strong Inference of Scienter ......23

       B.    Defendants Were Motivated to Artificially Inflate Quad's Stock Price ...........27

       C.    Plaintiff's Inference of Scienter is More Compelling than Defendants'
             Opposing Inference .............................................................................28

VI.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ...........28

VII.   THE COMPLAINT ESTABLISHES CONTROL PERSON LIABILITY .......30

VIII.  CONCLUSION.................................................................................................30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
No. 13-CV-5586 VEC, 2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)...................................12

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)...................................................................................................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................................6

*Asher v. Baxter Int'l. Inc.*,
377 F.3d 727 (7th Cir. 2004) ...............................................................................................28

*Basic v. Levinson*,
485 U.S. 224 (1988)................................................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................6

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...............................................................................................12

*Burstyn v. Worldwide Xceed Grp., Inc.*,
No. 01 CIV. 1125 (GEL), 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002) ...........................27

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)..................................................................................................30

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)...................................................................................23

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
No. 20-CV-2031 (JSR), 2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)........................... *passim*

*City of Westland Police & Fire Ret. Sys. v. MetLife*,
No. 12-CV0256 (LAK), 2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016) ................................22

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
No. 17 CIV. 0917 (LGS), 2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .............................23

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)................................................................................6, 28

**Page**

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................................28, 29

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ...............................................................................................17

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................................20, 24

*Gould v. Winstar Commc'ns, Inc.*,
    692 F.3d 148 (2d Cir. 2012).................................................................................................29

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)..................................................................................20

*Holbrook v. Trivago N.V.*,
    No. 17 CIV. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) ...............................11

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................................10

*In re Avon Sec. Litig.*,
    No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .............................22

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................................................15

*In re CannaVest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)..................................................................................30

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)..................................................................................12

*In re Delcath Sys., Inc. Sec. Litig.*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014)....................................................................................30

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)..............................................................................21, 26

*In re Henry Schein, Inc. Sec. Litig.*,
    No. 18-CV-01428 (MKB), 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019).............................15

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    No. 12 CIV. 8557 CM, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...................................21

**Page**

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)....................................................................................6

*In re Mylan N.V. Sec. Litig.*,
   No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)................................11

*In re Omnicom Group, Inc. Sec. Litig.*,
   No. 02 CIV. 4483 (RCC), 2005 WL 735937 (S.D.N.Y. Mar. 30, 2005)................................27

*In re Openwave Sys. Sec. Litig.*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007)..................................................................................29

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................................18

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
   No. 14-CV-3577 (JPO), 2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016) ..............................12

*In re Salix Pharms., Ltd.*,
   No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..............7, 12, 20, 23

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................................26

*In re Sprint Corp. Sec. Litig.*,
   232 F. Supp. 2d 1193 (D. Kan. 2002)..............................................................................15, 25

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
   No. CV157658MASLHG, 2017 WL 1658822 (D.N.J. Apr. 28, 2017)................................10

*In re ViroPharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) ....................................................................................12

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)..........................................................................................7, 8, 11

*In re Vivendi Universal S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011)..................................................................................18

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)..................................................................................14

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)................................................................................................28

**Page**

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
No. 15-CV-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016) ................................8, 11

*Kleinman v. Elan Corp.*,
706 F.3d 145 (2d Cir. 2013) ..................................................................................................7

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ..........................................................................................28, 30

*Martinek v. AmTrust Fin. Servs.*,
No. 19 CIV. 8030 (KPF), 2020 WL 4735189 ............................................................16, 17, 19

*Matrixx Initiatives v. Siracusano*,
563 U.S. 27 (2011) ...........................................................................................................6, 7

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014) ..................................................................................................7

*New Orleans Emps. Ret. Sys. v. Celestica*,
455 F. App'x 10 (2d Cir. 2011) .......................................................................................6, 20

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ................................................................................................24

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................................. *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ......................................................................................................21, 22

*Ontario Teachers' Pension Plan Bd. v. Teva Pharma. Indus. Ltd.*,
432 F. Supp. 3d. 131 (D. Conn. 2019) ..................................................................................27

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
595 F.3d 86 (2d Cir. 2010) ..................................................................................................11

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*,
333 F. Supp. 3d 338 (S.D.N.Y. 2018) ...................................................................................14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ................................................................................................18

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ..................................................................................................27

**Page**

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...................................................................................21

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 568 U.S.
   442 (2013) .............................................................................................................7

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
   968 F.3d 204 (2d Cir. 2020).........................................................................16, 23, 24

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015)..........................................................................8

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010).....................................................................................19

*Speakes v. Taro Pharms. Indus.*,
   No. 16-CV-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) ..............26

*Styles v. Westchester Cnty.*,
   No. 18 CV 12021 (VB), 2020 WL 1166404 (S.D.N.Y. Mar. 10, 2020) ............19, 21

*Tabak v. Canadian Solar Inc.*,
   549 F. App'x 24 (2d. Cir. 2013) ..............................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...........................................................................5, 6, 23, 24

*Tomaszewski v. Trevena, Inc.*,
   No. CV 18-4378, 2020 WL 5095865 (E.D. Pa. Aug. 28, 2020)...............................16

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)..................................................................................................19

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009).......................................................................29

*Wash. St. Inv. Bd. v. Odebrecht S.A.*,
   No. 17 CIV. 8118 (PGG), 2020 WL 2555431 (S.D.N.Y. May 20, 2020) ................18

*Yellowdog Partners LP v. CURO Grp. Holdings*,
   426 F. Supp. 3d 864 (D. Kan. 2019)...........................................................10, 15, 24

**Page**

**STATUTES, RULES AND REGULATIONS**

17 C.F.R. §240.10b-5....................................................................................................................7

Federal Rules of Civil Procedure
    Rule 12(b)(6)............................................................................................................................8

Lead Plaintiff Alaska Electrical Pension Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the Complaint and memorandum of law in support thereof ("Mem."). ECF Nos. 70-72.[1]

## I.    INTRODUCTION

This securities fraud action seeks to recover damages resulting from Defendants' false and misleading statements and omissions during the February 21, 2018 to October 29, 2019 Class Period. The false statements and omissions centered on the ability of "Quad 3.0," the name for Quad's transition from a traditional printing company to a marketing services provider, to replace revenue from, and contribute to, Quad's declining print business, the pace at which the Quad 3.0 transition needed to occur, as well as Quad's attempted acquisition of its biggest and only real print competitor, LSC Communications, Inc. ("LSC"), all of which impacted Quad's financial results and its ability to achieve its 2019 financial guidance. ¶¶6, 131. The Complaint alleges Defendants' false and misleading statements and omissions concerning these issues artificially inflated the price of Quad stock until October 29, 2019, when Quad announced dismal third quarter 2019 ("3Q19") financial results, slashed its 2019 guidance, implemented significant cost reduction activities to provide "financial flexibility," cut its "affordable and sustainable" dividend in half, and divested Quad's growing book business. ¶¶13, 132, 208-212. Defendants' disclosures caused a swift and severe drop in the price of Quad stock, which fell *57%* as the artificial inflation was removed, causing Lead Plaintiff and other Class members to suffer damages. ¶¶14-17, 133, 213.

---

[1]    Defendants are Quad/Graphics, Inc. ("Quad" or "Company"), J. Joel Quadracci ("Quadracci"), who has been chairman of the board, president, and CEO since 2010 and whose family maintains extensive control over Quad (¶¶23-24, 220-225), and David J. Honan ("Honan"), Quad's CFO (¶25). The "Complaint" is ECF No. 67 and is cited as "¶__."

## II.    BACKGROUND

Quad undertook its "Quad 3.0" transition because its print business, which generated more than 90% of Quad's consolidated net sales, was mired in a secular decline as traditional print content shifted from paper to electronic sources.  ¶¶37-46.  Although investors knew the print industry was declining and consolidating (¶37), they did not know that Quad was also mired in an undisclosed, "blood bath" price war with Quad's biggest and only real print competitor, LSC.  ¶¶52-56.

The battle between the two companies went far beyond normal competition.  A Quad senior executive stated privately that Quad and LSC were in a "price war" and had been "for some time," while LSC executives noted that Quad was "on fire" and "promising everything" in negotiations with potential customers, to the point that negotiations had become "Gettysburg."  ¶¶53, 55.  A presentation to Quad's board of directors explained that the print catalog industry – a significant source of Quad's revenues – had turned into a "two-horse race between LSC and Quad."  ¶54. When it came to book printing, Quad executives explained in an internal presentation that Quad was "the only printer other than LSC that can offer the largest Publishers a complete solution." ¶55.  The competition was so fierce that publishers "exploit[ed] the fact that LSC [and] Quad['s] CEO want to beat each other into oblivion."  *Id.*

Meanwhile, Quad acquired marketing firms to execute its 3.0 transition.  ¶¶5, 44-49.  These acquisitions created additional revenue for Quad, boosting its financial results and helping to offset the declining print business.  ¶¶5, 42, 44-49.  In connection with these acquisitions, Defendants touted Quad's ability to leverage its historical print expertise as part of an integrated marketing platform that would help its clients across traditional and digital channels.  ¶¶3, 173, 176, 202. Defendants assured investors that Quad was "accelerating" Quad 3.0 and that the transition would

create "profitable growth opportunities" and business for Quad's critically important print business.  ¶¶3, 42, 49, 150, 155, 163, 181, 226-231.

On October 31, 2018, in what Quadracci described as a "defining" and "historic" moment, Quad announced its acquisition of LSC in a $1.4 billion all-stock transaction expected to close in mid-2019.  ¶¶56, 62, 159.  Investors appreciated the industry-consolidating nature of Quad's largest ever acquisition, which Defendants said would generate cash to fund the 3.0 transition and $135 million in synergies for Quad in less than two years, described as capacity realization, administrative efficiency, and supply chain efficiencies.  ¶¶57, 60-63, 161.  But investors did not realize that by acquiring LSC, Quad stood to immediately boost its financial performance by eliminating the hyper-competitive war between the two companies, which would materially and positively impact Quad's 2019 financial results.  *See* ¶¶56, 66.

On February 19, 2019, after announcing the LSC acquisition and while in discussions with the Federal Trade Commission ("FTC") and Department of Justice ("DOJ"), Quad issued its 2019 financial guidance, calling for net sales of $4.05-$4.25 billion, adjusted EBITDA of $360-$400 million, and free cash flow of $145-$185 million.  ¶¶8, 169.  Defendants told investors that during 2019, the Company would see a decrease in adjusted EBITDA "in the front half of the year," but that there would be "growth in the back half of the year due to increasing synergies and revenues" in Quad 3.0 and productivity improvements.  ¶¶177-178, 180.  Although Defendants claimed the 2019 guidance was not tied to the LSC acquisition, Quadracci linked the two when he responded to a question during the February 20, 2019 conference call regarding Quad's 2019 guidance and EBITDA by stating, "But let's not forget that we have a pending large-scale consolidating acquisition happening."  ¶¶178-179.  To that end, Quadracci stated the FTC and DOJ review process was "going as planned," "as expected," and "corresponds to being ready to close by

- 3 -

midyear 2019." ¶¶182, 194 ("nothing has really changed here"). Defendants repeatedly told investors that Quad would experience growth in the "back half" of 2019, was on track to meet its 2019 guidance, and that the LSC acquisition would close by midyear 2019. ¶¶185-186, 190-191, 193.

However, on June 20, 2019, the DOJ sued to block Quad's acquisition of LSC. ¶¶9, 67, 196. On top of asserting that the acquisition would worsen the quality of the printing market, the DOJ publicly detailed the intense price war and "blood bath" between Quad and LSC. ¶¶67-69, 71. Defendants came out swinging, vowing to "vigorously defend" the "historic" LSC acquisition. ¶¶10, 72, 159. Despite this unequivocal commitment, only a month later, on July 23, 2019, Defendants announced Quad's abandonment of the LSC acquisition, which triggered a reverse termination fee requiring Quad to pay LSC $45 million. ¶¶10, 73, 196. After the deal's termination, LSC substantially lowered its 2019 financial forecasts, but Defendants *reaffirmed* Quad's 2019 guidance. ¶¶10, 197, 198 ("we remain on track to achieve our full-year 2019 guidance"). Defendants did not disclose, however, that Quad needed to rapidly accelerate its Quad 3.0 transition and that without ending hyper-competitive "blood bath" with LSC, Quad could not achieve its 2019 guidance. ¶¶10, 66, 206.

Defendants' false statements and omissions during the Class Period had their intended effect, artificially inflating the price of Quad stock to over $30 per share. ¶¶131, 238. On September 4, 2019, Quad announced the sale of its industrial wood crating business, Transpak Corporation ("Transpak"), for $10 million, attributing it to the Quad 3.0 strategy, with Quadracci stating the "net proceeds of approximately $10 million will be used to *reduce debt*." ¶¶11, 75, 205. Less than a month later, on September 26, 2019, the SEC announced Quad's settlement of a long-running bribery and corruption scandal and formally charged Quad with Foreign Corrupt

Practice Act ("FCPA") violations. ¶¶76, 207. The SEC publicly detailed Quad's internal control weaknesses and that Quad engaged in multiple bribery schemes in Peru and China between 2010 and 2016, which included paying off judges, creating sham transactions, bribing foreign officials, and illegally conducting business with Cuba. ¶¶77-130. Despite assuring investors less than a month earlier that the Transpak sale would be used to "reduce debt," Quad paid $10 million to the SEC to resolve its bribery scandal. ¶¶11, 12, 76, 207, 232.

Then, after the market closed on October 29, 2019, Quad unexpectedly announced poor 3Q19 financial results that widely missed forecasts and disclosed that Quad 3.0 needed to be rapidly accelerated. ¶¶13, 132, 208. Defendants also announced Quad was slashing its 2019 guidance, implementing significant cost reduction activities needed to provide "financial flexibility," cutting its dividend in half, and divesting the Company's profitable and growing book business, which Defendants touted during the Class Period. ¶¶13, 132, 208-212. The stock market reaction was swift and severe. ¶¶13, 133, 213. After closing at $11.27 per share on October 29, 2019, Quad stock dropped $6.42 per share, or *57%*, to close at an *all-time low* of $4.85 per share on October 30, 2019. ¶¶14, 133, 213. Analysts were "absolutely shocked by these developments given the confidence management had just three months ago, despite all the incentive in the world to take a more cautious stance after the deal to acquire LSC . . . was blocked by the [DOJ]." ¶¶15, 134, 214.

## III.   APPLICABLE LEGAL STANDARDS

Under Rule 12(b)(6), the Court must consider the Complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to Plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).[2] Rather than parse allegations

---

[2]   Internal citations and quotations are omitted, and emphasis is added, unless otherwise noted herein.

individually, the "court[] must consider the complaint in its entirety" to determine if the claims are properly stated. *Id.* at 322. To defeat a motion to dismiss, a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (alteration in original).

To state a claim for a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 37 n.4 (2011). The pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") apply to the elements of falsity and scienter, but courts still "do not require the pleading of detailed evidentiary matter in securities litigation." *New Orleans Emps. Ret. Sys. v. Celestica*, 455 F. App'x 10, 15 (2d Cir. 2011).[3] Defendants argue Plaintiff failed to plead: (1) any material misstatements or omissions; (2) scienter; and (3) loss causation.[4] Defendants are wrong.

---

[3]   As a result of these pleading requirements, "motions to dismiss in securities fraud cases have become all too common where the procedural posture of the case renders most of the defendants' arguments futile." *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001).

[4]   Without labeling their argument as "puzzle pleading," Defendants argue exactly that, claiming the Complaint's pleading style has been soundly rejected. Mem. at 12. "But [Quad's] characterization of the [Complaint] is inaccurate." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). As in *CBS*, the Complaint "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading." *Id.* Defendants' brief demonstrates their understanding of Plaintiff's allegations.

## IV.   THE COMPLAINT ADEQUATELY PLEADS MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS

Under Rule 10b-5, it is unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5. Facts are material "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38; *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("The test . . . is not whether the statement is misleading in and of itself, but whether defendants' representations, *taken together and in context*, would have misled a reasonable investor."). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013). Indeed, "the law is well settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 568 U.S. 442 (2013). Omissions are actionable when there is a duty to disclose the omitted facts. *Basic v. Levinson*, 485 U.S. 224, 239, n.17 (1988). This duty can arise either from a legal disclosure obligation or "as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *In re Salix Pharms., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *5 (S.D.N.Y. Apr. 22, 2016); *see also Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

To allege false and misleading statements or omissions, Plaintiffs need only "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent," by pleading facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78 (S.D.N.Y. 2015). Plaintiff has done so here.

### A.    The Complaint Pleads Actionable Misstatements and Omissions

The Complaint satisfies the standards for pleading false statements by identifying the time, place, and content of each alleged misrepresentation and omission (¶¶138-145, 148-151, 152-157, 159-163, 165-183, 185-194, 196-207); why it was misleading when made (¶¶147, 152, 158, 164, 184, 195, 206); and why the misrepresented information was material to investors (¶131). Nothing more is required.[5] Defendants' materially false statements and omissions fall into the following categories: (1) the Quad 3.0 transition; (2) the LSC acquisition and the Company's 2019 financial performance; and (3) the sale of Transpak. Although Defendants' statements can be so categorized, it is also true that Defendants' statements are interrelated as they made up "a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie." *Vivendi*, 838 F.3d at 250.[6]

---

[5]    On a motion to dismiss, courts generally cannot consider documents outside the four corners of the complaint. Fed. R. Civ. P. 12(b)(6). Nevertheless, Defendants improperly appended numerous exhibits to their Motion (ECF No. 71), including analyst reports neither cited nor incorporated by reference into the Complaint (Exs. O, P, Q, R, T, U), filings in other litigation from which Defendants draw facts and inferences in their favor (Exs. S, V, W), and SEC filings never mentioned in the Complaint and from outside the Class Period (Exs. AA, BB). The Court should disregard all arguments based on these documents. *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 27-29 (S.D.N.Y. 2019) (considering documents "explicitly quoted in the Complaint" but declining to consider other exhibits because "this Court may not properly consider materials outside the Complaint without treating the motion as one for summary judgment").

[6]    The Court need not "rule on the sufficiency of every alleged misrepresentation at this stage of the proceedings as all that is required is for Plaintiff to have pled sufficient facts to permit a reasonable person to find a plausible claim for relief for the misrepresentation element." *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 15-CV-02393-MGL, 2016 WL 3981236, at *7 (D.S.C. July 25, 2016).

### 1.    Defendants Misrepresented and Omitted Facts Regarding the Quad 3.0 Transition and the Status of Quad's Business

During the Class Period, Defendants consistently described Quad as successfully executing, aggressively implementing, and "accelerat[ing]" its Quad 3.0 transition. *See, e.g.*, ¶¶138-139, 148, 151, 155-156, 162, 165-167, 171, 176, 185, 187-189, 198, 200-203. Defendants assured investors that Quad 3.0 was driving additional print revenue (¶¶144, 167, 176) and helping offset ongoing print industry volume and pricing pressures (¶¶139, 142, 189). Through the combination of Quad 3.0 and its generation of "growth opportunities" (¶¶140, 150, 154-155, 162-163, 189) and more print revenue, Defendants repeatedly assured investors that Quad prioritized and would consistently maintain an "affordable and sustainable" dividend. ¶¶139, 150, 155, 156, 161, 163, 168, 188, 191, 199, 201, 204. Adding on to this, Defendants pointed to the strength of the Company's growing book business (¶¶145-146, 157, 172, 175, 192). Defendants' statements regarding Quad 3.0 "created the appearance of a company well-positioned to grow in the digital and advertising arenas while simultaneously generating additional print business as a way to offset secular contraction in the traditional print industry and achieve its financial targets." ¶49. Analysts were convinced, stating Quad was the "best house" for investors in the printing business, and "very safe," while pointing to its superior dividend. ¶50.

When considered in context, Defendants' false statements, half-truths, and omissions created a misleading picture of Quad's business. For example, although Quad undertook certain actions to accelerate Quad 3.0, such as acquiring and investing in marketing companies (¶¶44-50), Defendants failed to disclose that the pace of the 3.0 transition needed to be significantly and rapidly accelerated at all times and overstated the ability of Quad 3.0, without such rapid, additional acceleration, to meaningfully offset Quad's declining print business. ¶¶51, 147, 152, 158, 164, 184, 195, 206. And, as set forth below, the known pricing pressures of the declining

print market were further exacerbated by the Company's undisclosed and ongoing price war with Quad's biggest competitor, LSC.  *See* §IV.A.2, *infra*.  Put simply, Defendants' Class Period statements painted a far different picture than their end-of-Class Period disclosure, when Quad announced dismal 3Q19 financial results, cut the recently affirmed 2019 guidance, and admitted that Quad needed to take "decisive actions" to "further accelerate" Quad 3.0, which included cost reductions, slashing the "sustainable" dividend in half, and divesting the successful and growing books business (as well as Transpak).  ¶¶13-16, 207-214; *see In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (statements actionably false if they "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed] . . . .") (alteration in original).  "Plaintiff[] [has] identified various statements by defendants concerning the transition and [Quad's] financial performance, [has] alleged specific facts that should have been disclosed, and [has] explained in the complaint how the statements were misleading in light of the omissions." *Yellowdog Partners LP v. CURO Grp. Holdings*, 426 F. Supp. 3d 864, 871 (D. Kan. 2019).

Defendants argue there are ***no*** particular facts in the Complaint supporting allegations that Defendants' statements and omissions regarding Quad 3.0 were false and misleading.  Mem. at 13.  But Defendants' claim that the Complaint should be dismissed because it lacks "confidential witness statements" or "contemporaneous internal documents" (Mem. at 13) misses the mark and attempts to create a pleading standard that simply does not exist. *Lexmark*, 367 F. Supp. 3d at 38 ("Plaintiffs do not rely on any confidential witnesses, but this Court is aware of no authority requiring confidential witness allegations."); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. CV157658MASLHG, 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017) ("Similarly, the mere lack

of citations to confidential informants and internal documents does not preclude the Court from finding sufficient allegations of scienter based on its holistic review of the Complaint.").[7]

Defendants also argue they "never made any promises" that Quad 3.0 would "outpace or match dollar-for-dollar print revenue declines." Mem. at 14. Defendants miss the point, which is that once Defendants made statements about the progress of the Quad 3.0 transition, they had a duty to disclose any other facts necessary to ensure those statements were not misleading. *See Vivendi*, 838 F.3d at 258 ("once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic."). That duty persisted even if Defendants' statements were literally correct (they were not) because the omitted information (the need to rapidly accelerate Quad 3.0 beyond existing levels) made the statements materially misleading. *See In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at \*4 (S.D.N.Y. Mar. 28, 2018); *see Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("Some literally accurate statements can, through their context and manner of presentation, [become] devices which mislead investors."). In short, Defendants had a duty not to tell investors "half-truths." *Vivendi*, 838 F.3d at 240; *see, e.g.*, *3D Sys.*, 2016 WL 3981236, at \*5 (holding statements that "represented [company's] acquisition strategy to investors as positive . . .," including statements that defendants

---

[7] The facts of *Holbrook v. Trivago N.V.*, No. 17 CIV. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) are clearly distinguishable. Mem. at 13-14. There, the court found that defendants disclosed the new business policy that was providing the company with a financial boost, as well as the fact that the boost would be short term, and even directly stated that revenues would "go back to old levels." *Trivago*, 2019 WL 948809, at \*7, \*18 ("plaintiffs' primary objections amount to little more than quibbles with Trivago's word choice."). Here, by contrast, Defendants assured investors that Quad 3.0 was working, while failing to disclose that it needed dramatic acceleration, which required slashing the dividend and significant cost cutting.

were "very happy" with how it was going, "all the while presenting little downside about the process," were sufficiently alleged as misleading).[8]

That Defendants' statements about the pace of the Quad 3.0 transition and its apparent success did, in fact, mislead the market is also evident from the reaction when Defendants announced the truth, which included significant negative financial impacts and the need to rapidly accelerate the Quad 3.0 transition, with Quad stock dropping *57%* to an all-time low.  *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236 (S.D.N.Y. 2010) (finding "market's reaction in the wake of. . . disclosure suggests plaintiffs are correct" regarding materiality and falsity).  One analyst stating it was "absolutely shocked by these developments given the confidence management had just three months ago, despite all the incentive in the world to take a more cautious stance after the deal to acquire LSC . . . was blocked by the Justice Department."  ¶¶213-214.  The allegation that even market analysts tasked with closely following the Company were "absolutely shocked" supports a finding that the omitted facts were necessary to make Defendants' statements not misleading.  *See Salix*, 2016 WL 1629341, at *10-11 (omission that misled analysts regarding inventory levels was "material and misleading"); *In re Ply Gem Holdings, Inc. Sec. Litig.*, No. 14-CV-3577 (JPO), 2016 WL 5339541, at * (S.D.N.Y. Sept. 23, 2016) ("analyst disappointment resulting directly from the alleged omissions supports an inference that the adverse

---

[8]    Defendants twist their statements in order to argue alternative and innocent meanings, but such factual disputes are inappropriate for a motion to dismiss wherein all inferences are to be drawn in plaintiff's favor.  *See Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 VEC, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014) ("The discrepancy between the two parties' interpretation of the facts. . . cannot be resolved on a motion to dismiss."); *In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 470 n.20 (E.D. Pa. 2014) (denying motion to dismiss and rejecting defendants' alternative version of the facts, noting plaintiff is entitled "to discovery to flesh out the truth of the narrative"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) (reversing dismissal of complaint and rejecting defendants' alternative interpretation of statements because "[w]hile this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most plausible – one").

market reaction was predictable, and thus that the omissions were qualitatively material."). The falsity of Defendants' statements is adequately alleged.

### 2. Defendants Misrepresented and Omitted Material Facts Regarding the LSC Acquisition and the Company's 2019 Financial Performance and Outlook

Although Defendants lodge many fact-bound arguments regarding Quad's failed acquisition of LSC, including that Quad expected to achieve synergies from the acquisition (Mem. at 17), that Quad intended to defend the antitrust suit (*id.* at 17), and that it was reasonable for Quad to maintain its 2019 guidance after the acquisition failed (*id.* at 17-18), Defendants downplay the import of the Complaint's LSC-related allegations:  that Quad was engaged in a brutal and undisclosed "price war" with its largest competitor (LSC) that was negatively impacting Quad's financial results and the success of the 3.0 transition.  *See, e.g.*, ¶66 ("Without eliminating LSC and ending the ongoing blood bath for customers between the two companies, Quad would simply be unable to implement its Quad 3.0 transition at the speed necessary to offset the secular declines in the print industry and achieve its 2019 guidance.").[9]

Rather than meet the Complaint's well-pled allegations head-on, Defendants sidestep and argue they did not have to pejoratively describe Quad's business.  Mem. at 17 nn.31 & 32.  This argument misses the mark, as do the cases cited.  The Complaint lays bare the hypercompetitive environment between Quad and LSC.  For example, it describes a senior Quad executive's admission of an ongoing, long-term "price war" that would not be changing (¶53), a Quad board of directors' presentation detailing a "two-horse race between LSC and Quad" in the Company's important catalog printing business (¶54), and an internal presentation where Quad executives

---

[9]    The Complaint also adds that the acquisition stood to significantly bolster Quad's books business, which represented 27% of LSC's sales.  ¶59.

- 13 -

explained that only Quad and LSC could "offer the largest Publishers a complete solution" (¶55). The Complaint also details intense bidding wars between the companies, where Quad was "on fire" and "promising everything." ¶55. Put simply, they were at war with each other.

Thus, the Complaint illuminates the chasm between Quad's internal state of affairs and Defendants' public statements, which spoke of general "pricing pressures" in the market and "net synergies" to be gained from acquiring LSC. *Compare id. with* ¶¶139, 174. The omission of these *facts*, regardless of whether Defendants used pejorative terms to describe them, is sufficient to render Defendants' statements materially false and misleading because they left investors unable to evaluate risks to Quad's business, the need to rapidly accelerate Quad 3.0, and how the failed LSC acquisition would reignite the war between LSC and Quad, negatively impacting Quad's 2019 financial performance.[10] *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, No. 20-CV-2031 (JSR), 2020 WL 4547217, at *6 (S.D.N.Y. Aug. 6, 2020) ("*WWE*") ("Once appropriately accepted as true, plaintiff's allegations about the deteriorating relationship between WWE and Saudi Arabia plausibly support plaintiff's claims that WWE's statements were misleading.").

To that end, the Complaint also alleges that without elimination of the price war, Quad could not achieve its 2019 financial guidance. *See, e.g.*, ¶6 ("Put simply, for Quad to achieve its financial targets, it needed to rapidly accelerate the pace of its Quad 3.0 transition and simultaneously address the ongoing price war with Quad's biggest rival, which was compressing

---

[10]   Defendants argue the fact that LSC significantly reduced its 2019 outlook, warned that LSC would report a loss, and suspended its dividend payments on the heels of the failed acquisition (¶73), while Defendants reaffirmed Quad's 2019 guidance (¶197), is not indicative of falsity.   But the cases they cite regarding "competitors" are readily distinguishable because neither involved mergers, let alone failed mergers, where the financial condition of the acquiree was at issue. Mem. at 19 n.35 (citing *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*, 333 F. Supp. 3d 338 (S.D.N.Y. 2018) and *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011)).

profit margins in Quad's print business that was already suffering from secular market declines."). Despite this, Defendants repeatedly reaffirmed Quad's 2019 guidance, assuring investors that growth would come in the "back half of the year" due to Quad 3.0. ¶¶177-180, 186, 190-191, 193, 197-198, 204. Simultaneously, Defendants abandoned much-needed cost-cutting activities because of the LSC acquisition (¶204), which *slowed* the pace of Quad 3.0. Thus, while the Company's 2019 guidance may not have been dependent on *revenues* from LSC or achieving synergies in 2019, it did depend on Quad and LSC no longer "beat[ing] each other into oblivion." ¶55. Defendants' statements, therefore, are actionable. *See In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428 (MKB), 2019 WL 8638851, at *10-11 (E.D.N.Y. Sept. 27, 2019) (plaintiff adequately pled misrepresentations and omissions regarding competition by alleging company engaged in undisclosed anticompetitive behavior); *CURO*, 2019 WL 6592651, at *1 ("Defendants failed to disclose to the public that the transition to open-end loans in Canada would be accelerated and that Curo's short-term performance would therefore be negatively impacted; and that Defendants therefore made false or misleading statements concerning the transition and Curo's expected 2018 financial performance.").

Defendants also omitted material facts regarding the Quad-LSC price war when they discussed Quad's dialogue with the DOJ as part of the antitrust review process. ¶182 (process going "as expected" and "going as planned"), ¶194 ("And so we've been in active dialogue with them all the way along the way in the expected process we're in. And so nothing has really changed here."). By raising these issues, Defendants obligated themselves to disclose facts that could impact the review process. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1219-1220 (D. Kan. 2002) ("By voluntarily choosing to speak about the merger's viability, the defendants were under a duty to be honest and forthright."); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.

Supp. 2d 148, 159-60 (S.D.N.Y. 2008) ("Once a corporation has elected to speak. . . Rule 10b-5 mandates that its speech must be truthful, accurate, and complete."). Defendants' statements painted a favorable picture without including the details that would have presented a complete and less favorable one. *See Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 214 (2d Cir. 2020) (reversing dismissal and finding non-disclosure of loan amounted to material omission because defendants "gave a false impression of the financial health of one of [the company's] largest assets."); *Tomaszewski v. Trevena, Inc.*, No. CV 18-4378, 2020 WL 5095865, at *8 (E.D. Pa. Aug. 28, 2020) ("Notwithstanding the FDA's serious disagreements with the Phase 3 studies, Soergel's statements would have caused a reasonable investor to believe that Soergel had no reason to expect that the NDA would not be approved.").[11]

Defendants further misled investors by unequivocally telling the market that Quad would defend the LSC acquisition, only to abandon that position a month later. ¶¶72-73, 196, 203-204. Given Quadracci's statement that acquiring LSC was a "defining moment in Quad's 47-year journey" (¶159) and a "historic business combination" (*id.*) that would create "long-term sustainable shareholder value" (*id.*), it was of critical importance to investors that Quad follow through on Defendants' promises to "vigorously defend" the transaction. Instead, Defendants changed their tune at the slightest sign of delay and less than one month after committing to "vigorously defend" the acquisition. This is sufficient to establish falsity. *Martinek v. AmTrust Fin. Servs.*, No. 19 CIV. 8030 (KPF), 2020 WL 4735189, at *12 ("But the very fact that Defendants decided to delist the preferred shares barely two months after the Merger closed – on bases that

---

[11]   Defendants claim the DOJ's successful antitrust action did not undermine any of Defendants' statements regarding the Quad-LSC merger. Mem. at 17. Defendants miss the point, which is two-fold:  at all times, Defendants failed to reveal the unusual and profit-sapping price war between the two companies – which is supported by internal Company documents; and Defendants maintained the Company's 2019 guidance after the merger failed, even though it depended on cessation of the price war and Quad's ability to neutralize a unique competitive threat.

were known to Defendants at the time they represented that they 'will' maintain the listings –

strongly suggests that Defendants knew this statement to be false when made.").

### 3. Defendants Made False and Misleading Statements Concerning the Transpak Sale

During the Class Period, Defendants highlighted Quad's packaging businesses. ¶146 ("we

continue to be in the packaging space. . . a place that we've been happy with and one we think

we'll grow long term."). Shortly before the end of the Class Period, on September 4, 2019, Quad

announced the sale of its heavy-duty industrial wood crating business, Transpak, for $10 million,

with Quadracci asserting the transaction would intensify Quad's focus on the "Quad 3.0 growth

strategy" and that the proceeds would be "used to reduce debt." ¶¶75, 205. But less than one

month later, the SEC formally charged Quad with extensive and long-running FCPA violations

that included bribing government officials via sham vendors to secure sales in Peru (¶¶82-93),

bribing judges to influence the outcome of tax litigation in Peru (¶¶94-108), concealing sales

transactions with Cuba (¶¶109-123), and engaging in bribery to secure sales in China (¶¶124-130).

Defendants' statement that the $10 million in proceeds would be used to pay down debt,

when juxtaposed against the fact that Quad was in the process of negotiating a settlement with the

SEC, which culminated in a $10 million settlement less than a month after Defendants' statement,

is sufficient to allege falsity at the pleadings stage. *AmTrust*, 2020 WL 4735189, at *12; *Fecht v.*

*Price Co.*, 70 F.3d 1078, 1080, 1083-84 (9th Cir. 1995) (shortness of time between false statement

and revelation of truth provides evidence of falsity when defendants "intentionally misrepresented

the financial condition of the Company, in particular its expansion program's prospects for

enhancing the Company's earnings.").

### B.   Defendants' Misstatements and Omissions Are Material

#### 1.   Defendants' Statements Are Not Corporate Optimism or Puffery

Defendants argue many of their statements were immaterial puffery.  Mem. at 16.  First, "materiality is a fact-intensive inquiry more appropriate for summary judgment or trial, and courts are loath to dismiss a securities fraud complaint on materiality grounds unless the omitted material is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Lexmark*, 367 F. Supp. 3d at 31.  Second, try as they might, Defendants cannot recast their statements, which omitted material facts, as dealing with inconsequential matters.  Mem. at 16-17.[12]  Indeed, "[w]hether a representation is mere puffery depends, in part, on the context in which it is made."  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (recognizing that although "some of the alleged statements, viewed in isolation," were "mere puffery," they were actionable when viewed in context and not immaterial as a matter of law).  Defendants' statements addressed critical matters facing the Company, such as the pace and success of the Quad 3.0 transition and the "historic" LSC acquisition, which impacted Quad's 2019 financial guidance.  Indeed, when Defendants stated the Periscope acquisition would "turbocharge" Quad's "existing offering" – a statement Defendants claim is puffery (Mem. at 16) – they misled investors regarding the then-existing need to rapidly accelerate

---

[12]   Defendants' citation of *Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004) wrongly combines **separate** quotes from the Second Circuit's analysis of bespeaks caution on the one hand and puffery on the other to argue statements of "corporate optimism" are "immaterial as a matter of law . . . ."  Mem. at 16.  Not so.  Rather, the Second Circuit held the bespeaks caution doctrine would render statements immaterial as a matter of law if they were accompanied by **adequate** cautionary language.  *Chang*, 355 F.3d at 173.  The question of "puffery," however, is one of context and, ultimately, materiality, and statements considered puffery under one set of facts may be material in other contexts.  *Wash. St. Inv. Bd. v. Odebrecht S.A.*, No. 17 CIV. 8118 (PGG), 2020 WL 2555431, at *17 (S.D.N.Y. May 20, 2020) (statements about competitive bidding made in reference to other statements "about an increasingly competitive business environment" were not puffery and omitted information "about Defendants' involvement in the bribery scheme"); *In re Vivendi Universal S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011) ("[T]he mere fact that a statement uses conclusory, indefinite, and unverifiable terms, rather than expressing a reason in dollars and cents, does not compel a conclusion that it is immaterial as a matter of law.").

Quad 3.0.  Statements concerning these issues, which omitted material information, were clearly material to investors.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (noting the issue of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

### 2.      The PSLRA's Safe Harbor Does Not Protect Defendants

Defendants vaguely argue "many challenged statements" are protected by the PSLRA's safe harbor.  Mem. at 14, 18-19.  For example, in *one* sentence and two footnotes, Defendants argue statements regarding Quad's ability to achieve its 2019 guidance were forward-looking, accompanied by meaningful cautionary language, and that the Complaint lacks allegations of actual knowledge.  *See* Mem. at 19.  But undeveloped arguments raised "only in passing" and "in two brief footnotes" cannot form the basis for dismissal.  *See Styles v. Westchester Cnty.*, No. 18 CV 12021 (VB), 2020 WL 1166404, at *7 (S.D.N.Y. Mar. 10, 2020) (refusing to consider defendants' undeveloped statute of limitations argument raised in "three vague, passing references").  The closest Defendants come to identifying a forward-looking statement is to point, in a footnote, to Quad's press releases and SEC filings including generic disclaimers that they contained forward-looking statements.  Mem. at 14 n.25.  Defendants' invocation of generic "risks" fares no better.  *Id.* at 14-15.

But as Defendants know, "generalized warning[s are] insufficient to invoke the safe harbor provision of the PSLRA."  *AmTrust*, 2020 WL 4735189, at *13; *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 770-71 (2d Cir. 2010) (rejecting boilerplate and generalized warnings as insufficient to invoke safe harbor); *WWE*, 2020 WL 4547217, at *6 ("While these words of caution warn that the announced 'agreement in principle' might not come to fruition in its precise form, however, they do not warn of the misrepresentation that plaintiff complains of: that there was never

- 19 -

an agreement in principle between the parties to begin with."). The law does not provide shelter for defendants who warn investors to "walk slowly because there might be a ditch ahead when [they knew] with near certainty that the Grand Canyon lies one foot away." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010). Indeed, Defendants' suggestion that they disclosed the secular print decline and the pace of the Quad 3.0 in the Company's SEC filings is unpersuasive because their generic warnings regarding the possibility of adverse impacts caused by general market conditions failed to disclose the specific impact of Quad's undisclosed price war with LSC and the current need to rapidly accelerate the 3.0 transition far beyond existing levels. *See Celestica*, 455 F. App'x. at 15.[13]

Even if the Court were to consider the argument, Defendants all but concede the ineffectiveness of their "warnings" by making clear that they were repeated regardless of changed circumstances. *See* Mem. at 5 n.3 (pointing to repeated "warnings" that were the "same" and "similar"); *see also Salix*, 2016 WL 1629341, at \*12 ("Defendants' failure to update these statements from quarter to quarter and from year to year renders them meaningless in light of the changing circumstances and risks.").

Contrary to Defendants' truncated safe harbor arguments, the need to rapidly accelerate Quad 3.0 and existence of the LSC price war was a ***then-known*** fact supported by internal Company presentations and statements. That it rendered Defendants' 2019 guidance statements misleading is further supported by the fact that Quadracci himself linked the acquisition to Quad's ability to hit its guidance. ¶179 (discussing Quad's 2019 financial performance and stating "let's

---

[13]   *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y. 2018), relied on by Defendants, is clearly distinguishable. That case involved risk warnings concerning ongoing clinical trials involving use of new and developing technology. *Id.* at 405. Here, by contrast, the secular print decline was known and the Complaint alleges that at the time of Defendants' statements, Quad needed to rapidly accelerate Quad 3.0 and reach, maintain, and preserve a cease fire with LSC in order to achieve Quad's 2019 guidance.

also not forget that we have a pending large-scale consolidating acquisition happening."). Courts regularly find similar statements, where the defendant failed to disclose important facts that investors needed to assess a situation, to be actionable. *See, e.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 401-02 (S.D.N.Y. 2012) (statements that "GE has performed well during the recent market volatility," and "we successfully met our commercial paper needs," held actionable where there were "serious difficulties in GE Capital's access to short-term financing"); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 CIV. 8557 CM, 2013 WL 6233561, at *13-14 (S.D.N.Y. Dec. 2, 2013) (positive statements discussing a business relationship made misleading by failure to disclose material risk to that relationship).

### 3. Defendants' Purported Opinion Statements Are Actionable

Defendants argue certain of their statements were inactionable opinions. Mem. at 15-16, 19. But as with safe harbor, Defendants' *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) arguments are "drastically undeveloped," with Defendants' analysis of their LSC and guidance "opinion" statements amounting to a ***single*** sentence. Mem. at 19. Such a passing reference "is not properly presented" to the Court or Plaintiff, and should "not be considered." *Styles*, 2020 WL 1166404, at *7.

Even if considered, Defendants' statements were not "opinion" because they represented the then-current state of affairs at the Company. When discussing Quad 3.0, Defendants repeatedly pointed to the current acceleration of the plan and stated that it was producing additional print revenue. *See* §IV.A.1, *supra*. Now, Defendants try to label these statements as subjective opinions for which they cannot be held liable. *See* Mem. at 15-16. As *Omnicare* makes clear, speakers cannot convert statement of facts to opinions by simply adding a qualifier such as "we believe." *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (stating that "once defendants cho[o]se to tout positive information to the market" they must "do so in a manner that

- 21 -

wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (alteration in original).

Second, under the applicable standard for statements of opinion or belief, a plaintiff must plead facts that "call into question the [speaker's] basis for offering the opinion." *Omnicare*, 575 U.S. at 194. Specifically, a plaintiff must "identify particular (and material) facts going to the basis for the [speaker's] opinion – facts about the inquiry the [speaker] did or did not conduct *or* the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* "The core inquiry when determining whether an omission renders an opinion misleading is whether the omitted facts conflict with what a reasonable investor would take from the statement itself." *In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019). The Complaint readily meets this standard.

Here, the Complaint provides detail of the hypercompetitive environment between Quad and LSC that formed the basis of the DOJ's antitrust action. *See* §IV.A.2, *supra*. With the failed acquisition and the resumption of the war between the companies, Defendants' repeated affirmance of Quad's 2019 guidance omitted material facts undermining Defendants' "opinions." *WWE*, 2020 WL 4547217, at *7 ("Thus, plaintiff has plausibly alleged that WWE's statement, even though cabined with the phrase 'I believe,' did not 'fairly align[] with the information in the issuer's possession at the time' and was thus misleading.") (citing *Omnicare*, 575 U.S. at 189). Quad's 2019 financial performance, as well as the success of Quad 3.0, hinged on consummation of the LSC acquisition. The omission of this fact, "is sufficient to plead that [Quad] did not actually believe the implicit representations it made to investors." *See City of Westland Police & Fire Ret. Sys. v. MetLife*, No. 12-CV0256 (LAK), 2016 WL 6652731, at *10 (S.D.N.Y. Nov. 10, 2016);

*Salix*, 2016 WL 1629341, at \*12 n.10 ("Even if the projections regarding future inventory levels are statements of opinion, those opinions either (1) are predicated upon untrue supporting statements of fact regarding current inventory levels, or (2) omit material facts about the speaker's inquiry into or knowledge of facts that would support the stated opinion. Therefore, the statements are actionable.").

## V.      THE COMPLAINT ADEQUATELY PLEADS SCIENTER

The PSLRA's "strong inference" of scienter standard is satisfied when, accepting the allegations as true and considering them collectively, a reasonable person would deem the inference of scienter at least as strong as an opposing inference. *Tellabs*, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences. . . ." *Id.* "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Scienter can be established via motive and opportunity allegations or facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Omega Healthcare*, 968 F.3d at 212. Allegations of "motive" are not necessary to show scienter (*Tellabs*, 551 U.S. at 325) and for this reason, Defendants' argument that scienter is lacking because the Complaint does not allege motive allegations is not only wrong (*see* §V.B, *infra*) but irrelevant, as are the cases cited. *See* Mem. at 19-20.

### A.      Plaintiff's Allegations Give Rise to a Strong Inference of Scienter

The Complaint sets forth detailed allegations demonstrating that Defendants' statements were made with knowledge or recklessness.[14]  *See, e.g.*, ¶¶24-30, 217-236.  Despite paying lip-

---

[14]    Because Plaintiff adequately pleads scienter as to Quadracci and Honan, Quad's scienter is also established. *See Cohen v. Kitov Pharms. Holdings, Ltd.*, No. 17 CIV. 0917 (LGS), 2018 WL 1406619, at \*9 (S.D.N.Y. Mar. 20, 2018) (imputing CEO's scienter to the corporation).

service to the need to holistically examine the Complaint, Defendants predictably attack each scienter allegation in isolation and argue each piece falls short. Mem. at 20-22. Defendants are wrong and their piecemeal strategy runs afoul of *Tellabs*. When viewed holistically, the facts identified in the Complaint give rise to a strong inference of scienter as to each Defendant. *See CURO*, 426 F. Supp. 3d at 876 (finding scienter adequately alleged where defendants misrepresented pace of corporate transition, and reasoning that "Defendants have attempted to attack those facts individually, but they have not persuaded the Court that the allegations, considered in their totality, are insufficient.").

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Omega Healthcare*, 968 F.3d at 215. "Thus, in determining whether the Complaint adequately alleges facts giving rise to a strong inference that Defendants acted recklessly, we focus on Defendants' degree of knowledge and the seriousness of the impact that results from their conduct." *Id.* The touchstone is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Where, as here, the Complaint alleges that Defendants knew facts or had access to information suggesting that their public statements were not accurate, "[s]uch allegations alone are enough to satisfy the pleading requirement for scienter." *Freudenberg*, 712 F. Supp. 2d at 197.

Plaintiff alleges that "for Quad to achieve its [2019] financial targets, it needed to rapidly accelerate the pace of its Quad 3.0 transition and simultaneously address the ongoing price war with Quad's biggest rival, which was compressing profit margins in Quad's print business that was already suffering from secular market declines." ¶6. As set forth above, despite a duty to

disclose, Defendants omitted key facts from their Class Period statements, including: (1) the need to rapidly accelerate Quad 3.0 far beyond existing levels; (2) the negative impact on Quad's financial results, and thus its 2019 guidance, caused by the failure to end the LSC price war; and (3) that the proceeds from the Transpak sale would not be used to pay down debt. *See* §IV.A, *supra*.

Contrary to Defendants' argument (Mem. at 21), the combination of the Individual Defendants' senior positions at Quad (¶¶24-30), Quadracci's uniquely extensive control over the Company (¶¶220-225), the importance of ending the LSC price war and rapidly accelerating Quad 3.0 (¶¶226-231), as well as their SOX certifications (¶¶218-219), especially in light of Quad's historically weak internal controls (¶¶232-236), all support a strong inference of scienter. *See WWE*, 2020 WL 4547217, at *8 ("Moreover, given the individual defendants' senior positions at [the Company]. . . plus the alleged importance of the. . . agreements to their employers' revenue, and the defendants' alleged comments to investors on the status of these agreements, the individual defendants either knew or recklessly disregarded this information as well."). Defendants contend there can be no scienter because the Complaint pleads no internal reports. Mem. at 20. But the Complaint does exactly that. *See* ¶¶53-55, 67. And Defendants' own statements stressed the importance of the LSC acquisition to the Company, its financial performance, and its ability to execute the Quad 3.0 transition, further supporting scienter. ¶159; *see Lexmark*, 367 F. Supp. 3d at 38 ("While not dispositive, the importance of [the issue] to [the Company's] business moves the needle in Plaintiffs' favor."); *Sprint*, 232 F. Supp. 2d at 1226 (finding scienter alleged and reasoning "the question is not whether the Sprint defendants knew that the merger ultimately would be blocked; rather, the question is whether the Sprint defendants knew that the nondisclosure of certain information, coupled with the . . . optimistic statement that the merger

would go through, would mislead its shareholders."). And even if this were not the case, "it is virtually inconceivable that [Quadracci and Honan] would not have been aware" of the need to rapidly accelerate Quad 3.0 and the negative impacts of not ending the price war with LSC. *See WWE*, 2020 WL 4547217, at \*9.

Given the frequency with which Quadracci and Honan spoke about LSC, pricing pressures in the print business, and the status of Quad 3.0 during the Class Period, "surely an inference of knowledge may be appropriate . . . where it would be 'absurd to suggest that [they] w[ere] without knowledge of the" problems Quad was facing and the considerable acceleration necessary to fix them. *In re Gen. Elec.*, 857 F. Supp. 2d at 395; *see also Speakes v. Taro Pharms. Indus.*, No. 16-CV-08318 (ALC), 2018 WL 4572987, at \*9 (S.D.N.Y. Sept. 24, 2018) (finding strong inference of CEO and CFO's scienter where they spoke specifically to the issues on earnings calls). Indeed, "[i]n order to speak so knowledgeably regarding the state of" Quad's 3.0 transition, LSC, and the Company's financial condition, Quadracci and Honan "must have educated [themselves] regarding [Quad's] financial health, presumably both by reading [the Company's] financial reports and by performing [their] own due diligence." *In re Gen. Elec.*, 857 F. Supp. 2d at 395-96. At the very least, it is inconceivable that Defendants only discovered Quad's need to rapidly accelerate the Quad 3.0 transition and the negative financial impact of not acquiring LSC at the end of the Class Period, when Quad widely missed market expectations for 3Q19. *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("It is simply not a plausible opposing inference that the Company's officers – sophisticated executives actively engaged in the planning of these transactions – were ignorant of the transactions' consequences on the Company's deferred tax assets."). Scienter is adequately alleged.

### B.   Defendants Were Motivated to Artificially Inflate Quad's Stock Price

Defendants wrongly assert the Complaint contains no motive allegations.  Mem. at 19. Building on this erroneous position, Defendants incorrectly suggest that the sole motive to be divined from the Complaint is that "Defendants desired to artificially inflate the Company's stock price."  *See id*.  Defendants ignore clear motive allegations that, when considered holistically with other scienter allegations, support a finding that scienter is adequately alleged.

Motive allegations take many forms and are upheld in a variety of settings.  Artificially inflating a stock's price to achieve a specific goal, such as using the inflated stock as currency to acquire another company, can satisfy the PSLRA's scienter pleading requirement.  *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (upholding scienter allegation based on motive to artificially inflate stock price "with an eye toward using its stock to acquire [another company]."); *Burstyn v. Worldwide Xceed Grp., Inc.*, No. 01 CIV. 1125 (GEL), 2002 WL 31191741, at \*5 (S.D.N.Y. Sept. 30, 2002) (denying motion to dismiss and finding motive "sufficiently concrete" for scienter where defendants artificially inflated stock price to acquire companies); *Ontario Teachers' Pension Plan Bd. v. Teva Pharma. Indus. Ltd.*, 432 F. Supp. 3d. 131, 169 (D. Conn. 2019) (same); *see also In re Omnicom Group, Inc. Sec. Litig.*, No. 02 CIV. 4483 (RCC), 2005 WL 735937, at \*13 (S.D.N.Y. Mar. 30, 2005) (same).

Defendants ignore that Quad's attempted, "historic" LSC acquisition was an all-stock transaction and that Defendants were motivated to artificially inflate Quad's stock price to achieve the specific goal of acquiring LSC, which is a sufficient motive for pleading scienter.  *See* ¶¶7, 56, 65, 131, 159, 161, 174, 185, 189.  "Such allegations of motive, taken together with other circumstantial evidence that defendants should have known the falsity of their statements, perfectly

- 27 -

plausibly supports an inference of scienter embracing the entire alleged scheme." *WWE*, 2020 WL 4547217, at *10.[15]

### C.   Plaintiff's Inference of Scienter is More Compelling than Defendants' Opposing Inference

In an effort to raise a plausible competing inference, Defendants posit a series of unanswered questions tethered to the idea that a short-term fraud would be of little value. Mem. at 23. But the mere suggestion that corporations do not commit frauds yielding only short-term benefits does not rise to the level of a plausible competing inference. Indeed, "the securities laws forbid foolish frauds along with clever ones," *Asher v. Baxter Int'l. Inc.*, 377 F.3d 727, 728 (7th Cir. 2004)), and courts are frequently presented with short-term frauds. *See, e.g.*, *Lexmark*, 367 F. Supp. 3d at 16 (finding circumstantial evidence of scienter where plaintiff alleged a channel stuffing scheme that yielded short term financial benefits). At best, Defendants' "alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat this inference of scienter." *WWE*, 2020 WL 4547217, at *9.

## VI.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

To plead loss causation, a plaintiff need only allege "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This burden "is not a heavy one," *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797

---

[15] The cases cited by Defendants are not on point. Mem. at 19. For example, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) and *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28-29 (2d. Cir. 2013) simply stand for the proposition that it is not enough for a plaintiff to plead motive-based scienter by pointing to motives generally possessed by most corporate officers and directors, such as a desire to appear profitable, keep stock prices high, or protect executive compensation. Likewise, *CBS Corp.*, 433 F. Supp. 3d at 544, addressed motive allegations in the context of stock trading by individual defendants while also recognizing that "generally possessed" motives do not suffice. The allegations, here, however, establish a concrete, acquisition-based motive for Defendants to inflate the price of Quad stock.

F.3d 160, 187 (2d Cir. 2015), and a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. A plaintiff is not required to allege that the entire loss is attributable to the misstatements or omissions. *See Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 162 (2d Cir. 2012) (plaintiff need only establish facts raising a "reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself").

The Complaint alleges Quad's stock price was inflated by Defendants' repeated material misstatements of present fact and omissions concerning the true extent to which print industry volume and pricing pressures 'including Quad's ongoing price war with LSC' impacted Quad's business, the inability of Quad to offset those losses, and concealed the true extent to which the Quad 3.0 transition needed to be rapidly accelerated. ¶¶237-244. Quad's stock price plummeted *57%* in concert with the revelations on October 29, 2019, when the Company shocked investors with poor financial results, lowered 2019 guidance, cut the Company's dividend in half, divested the book business, and implemented a host of additional cost cutting measures. ¶¶207-215; 239-240.[16] The fact that Quad's stock lost more than half its value in response to the October 29, 2019 disclosure, while on the same day the Russell 3000 Forms and Bulk Printing index fell only 0.1% and the broader Russell 3000 index gained less than 0.1% (¶213), is evidence that the disclosed information was not known to the market. *See, e.g.*, *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 609 (S.D.N.Y. 2009) (allegation that stock declined after corrective disclosure sufficient to plead loss causation); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252 (S.D.N.Y. 2007) (same). Nothing more is required to be alleged to plead loss

---

[16] The Complaint also alleges that the September 26, 2019 disclosure of Quad's agreement to pay the SEC $10 million revealed that the Transpak proceeds would not be used to "reduce debt." ¶207.

- 29 -

causation.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014) (noting loss causation adequately pled where plaintiff identified corrective disclosures and alleged that price of stock declined as a result).

## VII.   THE COMPLAINT ESTABLISHES CONTROL PERSON LIABILITY

Defendants' sole argument regarding Section 20(a) is that Plaintiff fails to sufficiently plead a primary securities fraud claim.  *See* Mot. at 25.  Because Plaintiff adequately pled its primary violations, and because Plaintiff adequately alleged a control person violation, the Motion to dismiss should be denied.  *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014).

## VIII.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.[17]

DATED:  September 11, 2020                ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD


                                          *s/ David A. Rosenfeld*
                                          DAVID A. ROSENFELD

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com
                                          drosenfeld@rgrdlaw.com

---

[17]    If the Court grants Defendants' motion in whole or in part, Plaintiff respectfully requests leave to amend, which is typically freely given.  *See Loreley Fin.*, 797 F.3d at 190.  "Defendants have not pointed to any compelling reason why leave to amend should be denied."  *In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 257 (S.D.N.Y. 2018).

ROBBINS GELLER RUDMAN
 & DOWD LLP
JACK REISE
ROBERT J. ROBBINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com

*Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on September 11, 2020, I authorized a true and correct copy of the Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint, to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*s/ David A. Rosenfeld*

DAVID A. ROSENFELD
